IN THE U.S. DISTRICT COURT OF MARYLAND
FOR DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Mr. Craig Dorsey | * | |
|    et al. | | |
| | * | |
| *On behalf of themselves and* | | |
| *others similarly situated* | * | |
| | | |
|    Plaintiffs | * | |
| | | |
| v. | * | Case No. 10-00092 CCB |
| | | |
| TGT Consulting, LLC | * | |
|    et al. | | |
| | * | |
|    Defendants | | |

_____/

MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
DECERTIFICATION AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by and through undersigned counsel, respectfully file this Opposition to Defendants' Motion for Summary Judgment (Or Alternatively, Decertification) (Doc. 137), cross move for partial Summary Judgment on Defendants' "tip credit" defense, as follows:

I.        Summary of Motion

No reasonable juror could conclude, based on the *admissible* evidence submitted by Defendants, that the Defendants have satisfied their burden of production and persuasion with respect to complying with the tip credit provisions of the Fair Labor Standards Act, 29 U.S.C. § 203(m) ("FLSA"). To the contrary, the overwhelming evidence from the Plaintiffs' and Defendants' witnesses, along with Defendants' documents, quite clearly establish that Defendants cannot carry their burden of proof that they complied with Section 203(m) of the FLSA.

In addition, and for various reasons discussed *infra*, Defendants' Motion for Decertification lacks factual and legal merit, is premature because all discovery has not concluded, is logically

inconsistent with the Motion for Summary Judgment, and would result in a severe waste of judicial time and resources because if granted, the Motion would only serve to sever (not dismiss) nearly sixty (60) tip credit claims, yet the alternative overtime claims would remain viable and are properly presented as a collective action.   The Plaintiffs ask that this Court not only deny Defendant's Motion for Summary Judgment and Decertification, but grant Summary Judgment to Plaintiffs on the Section 203(m) claim.

## II.        Burden of Proving Compliance with Section 203(m).

Defendants, as the employers, bear the burden of proving that they are entitled to take a "tip credit" pursuant to Section 203(m) of the FLSA.  See, e.g., Copantitla v. Fiskard Estiatorio, Inc., 788 F.Supp.2d 253, 288 (S.D.N.Y. 2011) (" 'Employers bear the burden of showing that they have satisfied this requirement by, for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law." (citation omitted)); Dominguez v. Quigley's Irish Pub, Inc., 790 F.Supp.2d 803, 818 (N.D. Ill. 2011); Ash v. Sambodromo, LLC, 2009 WL 3856367, at *6 (S.D. Fla. Nov. 17, 2009); Bernal v. Vankar Enterprises, Inc., 579 F.Supp.2d 804, 808 (W.D. Tex. 2008) ("Defendants, as employers, bear the burden of proving that they are entitled to taking tip credits."); see also Reich v. Chez Robert, Inc., 28 F.3d 401, 403 (3rd Cir. 1994) ("If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum-wage… ."); Richard et al. v. Marriott Corp., et al., 549 F.2d 303, 305 (4th Cir. 1977) (noting that restaurant employers must "precisely follow the language of 3(m)" of the FLSA).

The "inform" requirements of [S]ection 203(m) are "strictly construed."  See Chu Chung v. New Silver Palace Rest., 246 F.Supp.2d 220, 229 (S.D.N.Y. 2002) ("the two pre-requisites that the employee must fulfill to be eligible for the tip credit are strictly construed, and must be satisfied

even if the employee receives tips at least equivalent to the minimum wage.")

III.    Factual Background

   A.  Posture

The parties engaged in limited discovery as to three sports bars/nightclubs (Towson, BWI, and the Verizon Center (D.C.)).  Defendants deposed five former employees of the Greene Turtle, and stopped there, deciding not to depose a sixth employee which they were allowed to do.

In contrast, the Plaintiffs took a single deposition of Ms. Teri Devito ("Devito"), an Executive Vice President for the Defendants, as a Fed.R.Civ.P. 30(b)(6) witness, and served Interrogatories on Defendants which when answered and returned, incorporated the responses of Devito.  (Exhs. 1 and 2).  Plaintiffs also obtained documents pursuant to a Request for Production of Documents, including employee handbooks and training materials referenced and relied upon by Devito as part of her testimony.  (Exhs. 3-9).

Despite their initial desire to obtain full discovery, Defendants now seek to litigate their defense to the Plaintiffs' tip credit claims.  Even though the inform requirement of Section 203(m) of the FLSA is not onerous, discovery has revealed that the Greene Turtle's defense fails as a matter of law.  No reasonable juror could conclude anything other than that the Greene Turtle completely failed to comply with Section 203(m) of the FLSA.

   B.  Corporate Designee's Deposition

Devito testified as a corporate designee on behalf of the Defendants.  (Exh. 1).  Devito spends about 75% of her day on human resource ("HR") matters, and serves as the point of contact for getting information to the managers of the company-owned bars, i.e., "any employee-related items that [managers] might need advice on or counsel."   (Exh. 1; pgs. 11-12).  Devito testified that the Greene Turtle notifies employees of the tip credit "via the wage poster and the

handbook," but she candidly admitted that she never heard of the tip credit prior to this lawsuit. (Exh. 1; pg. 90-91).

### 1. Wage/Hour Posters

Perhaps the easiest way for an employer to inform employees of the provisions of the FLSA is to post an appropriate notice.  Although there is disagreement, some courts have held or suggested that the FLSA prepared by the Department of Labor ("DOL"), coupled with other actions, can constitute sufficient notice.[1]

Devito testified that prior to February 2010, the DOL's FLSA poster was not purchased, and she could not confirm whether any of the corporate owned bars had posted the DOL's FLSA poster prior to February 2010.  (Exh. 1; pgs. 40, 42, 44, 119).[2]  Devito admitted that they began disseminating the FLSA poster "[b]ecause of this lawsuit."  (Exh. 1; pg. 118).  As of February 2010, the Greene Turtle posted the DOL FLSA poster, which was purchased from a website in in February 2010 by Mike Pollard at Devito's direction.  (Exh.  1; pgs. 40, 43, 119).   There is no evidence that the FLSA poster was posted prior to February 2010.

### 2. Employment Related Documents

Another potential way to inform employees of the provisions of Section 203(m) is to provide employees written notice.

### i. *Employee Handbooks*

Devito testified that the current handbook went into effect in February 2010 (Exh. 1; pg. 17); however the current employee handbook produced by Defendants has an effective date of

---

[1]      As set forth infra, Plaintiffs do not concede that the posting of the DOL's FLSA poster satisfies the inform requirements of Section 203(m), and it certainly does not satisfy the inform requirements set forth in Maryland's Wage/Hour Law, LE art. § 3-419 ("MWHL").

[2]      Devito testified that posters are gratuitously sent to the various Bars, but she could not be more specific about what is sent, received and posted.  She thought the posters that were sent might be in the nature of "wash your hands after handling poultry."  (Exh. 1; pgs. 41-42, 114-15).

May 2010.  (Exh. 8).  In any event, there is no mention of the FLSA, much less the provisions of Section 203(m), in any previous employee handbook versions.  (Exhs. 4-7).

Devito testified that the employee handbook is the same for all corporate owned restaurants.  (Exh. 1; pg. 18-18).  Upon hire, the documents provided to employees include their I-9 form, applicable tax forms, and the employee handbook.  (Exh. 1; pgs. 19-21).  Generally, documents disseminated to employees at the different corporate-owned bars are the same, except for tax forms.  (Exh. 1; pg. 18).  Employment applications are also the same.  (Exh. 1; pg. 19).  There is no mention in these pre-lawsuit documents to Section 203(m) of the FLSA.

### ii.    Training Materials

Once hired, a tipped employee is given training materials.  (Exh. 1; pg. 20-21).  Employees receive a menu for home study and a 20 page binder of actual training materials.  (Exh. 1; pg. 23).  The training materials generally cover job duties and responsibilities, how to greet a table, how to take an order, and what is on the menu.  (Exh. 1; pg. 30).  Defendants do not make any claim that these training materials contain any reference to any provision of Section 203(m).

There are additional documents involving employment at the Greene Turtle.  For example, there is a training handbook for "Certified Trainers" ("CTs").  (Exh. 3).  CTs go through an eight (8) hour "train the trainer program," which is unpaid.  (Exh. 1; pg. 27).  CT training materials are designed to make sure that the CT understands the policies, procedures, the job description, the points of service, and upselling that goes along with a tipped employees' job.  (Exh. 1; pg. 26).  CTs are not generally involved in discussing wages with new employees, "because that's something that's discussed before hire with a potential new employee and the manager and ultimately the general manager interviewing that person."  (Exh. 1; pg. 54).  Devito testified that she hoped that what CTs inform employees of, is not different than what is in their own training

manuals.  (Exh. 1; pg. 88).  ).  Defendants do not make any claim that the CT training materials contain any reference to the provision of Section 203(m).  See (Exh. 3).

Managers upon hiring are given materials.  (Exh. 1; pg. 31 & Exh. 9).  According to Devito, managers receive a binder which includes "how to hire someone, the process that you go through, payroll... ."  (Exh. 1; pg. 32).  Devito testified that the checklist is what managers are supposed to discuss and go over with new hires.  (Exh. 1; pg. 83).  Defendants do not make any claim that the manager-in-training materials (known as the "starting line") contain any reference to any provision of Section 203(m), and the checklist referred to by Devito certainly contains no reference to informing new hires as to the payment of wages, let alone informing them of the provisions of Section 203(m).  See (Exhs. 9 & 10).  In sum, there is a total lack of evidence corroborating Defendants' claims that they verbally informed employees of information which satisfies the provisions of Section 203(m).

### iii.    Paystubs

The Plaintiffs received bi-weekly pay from the Greene Turtle, and received pay stubs setting forth the details of the wages paid and tips reported.  Devito testified that paystubs (also referred to as paychecks) are different than earning statements.  (Exh. 1; pg. 93).  Devito refused to admit that a pay stub does not communicate to an employee the minimum wage (Exh. 1; pg. 94-97), but it is clear from some of the paystubs produced in this case that there is no reference to the minimum wage or the amount of tips that the Greene Turtle *allegedly* applies against the minimum wage.  (Doc. 137-13).  Rather, the information set forth in a pay stub is the pay period, the date of pay, the hours worked, and the amount of tips.  (Exh.1; pg. 95).  Even Devito could not understand various internal reference codes and numbers contained on an earnings statement (Exh. 1; pg. 96-97).

### 3.   Informing Employees Of The Provisions of Section 203(m)

There is no admissible evidence that any Plaintiff in this case was informed of the provisions of Section 203(m).   To the extent that the Defendants now seek to claim that the employees generally, and the Plaintiffs specifically, are informed of the provisions of Section 203(m), Devito's own testimony does not support such a assertion.

Devito first claimed that new employees were "absolutely" informed of their rate of pay during the interview process.  (Exh. 1; pg. 55).  But Devito was forced to retreat from her "absolute" claim, after she admitted that she could not testify to what a manager actually said to a potential hiree or a new employee, or even whether the discussion of wages came up at the time of hire, but just what manager are trained to say.  (Exh. 1; pgs. 58, 68).  But, Devito claimed managers were *instructed* to tell new employees that they will be receiving a subminimum wage rate because they will earn and report their tips following the completion of training.  (Exh. 1; pgs. 61-62).

Yet, under cross examination, Devito could not even testify as to the exact verbiage used, and could not identify what was in the training binders given to managers.   (Exh. 1; pgs. 63).  Devito did not know where the term "subminimum wage" even came from, and did not know whether it appeared in any documents maintained by the Greene Turtle.  (Exh. 1; pgs. 63-64).  While she at first claimed that managers were trained to say that once a tipped employee completed training, they would be making "three dollars and something cents per hour," she admitted that she could not testify as to whether managers actually referred to the rate paid to employees as "three something an hour," "3.63 an hour," "below minimum wage," "half minimum wage," or used the term "sub minimum wage."  (Exh. 1; pgs. 65-66, 68, 74, 80).  When talking with potential hirees, Devito could not testify as to what terms managers might use, *but she did admit that the only thing that is said with respect to tips is that they must be reported.*  (Exh. 1; pgs. 66-68).

Critically important, Devito admitted that she did not know whether managers tell tipped employees that all or part of their tips are being applied against the minimum wage owed by the Greene Turtle.  (Exh. 1; pg. 85).  Devito testified that she did not know whether, from January 1, 2007 through January 1, 2010, anyone within the Greene Turtle system provided any tipped employee with any information regarding the existence of the FLSA.  (Exh. 1; pgs. 68-69).  Even though she is in charge of HR and wage/hour compliance, Devito also did not know whether, at any of the Maryland bars operated by Defendants, any information was provided with respect to any provision of Maryland's law concerning the payment of minimum wages.  (Exh. 1; pgs. 69-70). Thus, Defendants have failed to produce any pre-2010 documents regarding these points.

### C. Uniform Testimony of Plaintiffs That They Received No Notice By Defendants Of Their Intention to Take The Tip Credit Before Making Sub-Minimum Wage Payments.

Based on the admissible evidence in this case, there is no genuine dispute of material fact that the Plaintiffs, and the class as a whole, were not informed by their employer prior to receiving wage payments, of the provisions of Section 3(m) of the FLSA.[3]

#### 1. Ashton Nicolas

The Defendants chose to depose Ms. Ashton Nicolas ("Nicolas").  Nicolas worked at the Towson Greene Turtle location from August 2, 2007 through June of 2010.  (Exh 11; Nicolas Dep. pgs. 9-10).  Nicolas testified that she was never informed of the tip credit, or that part of her tips would be used to satisfy the minimum wage obligation of the Greene Turtle.  (Exh. 11; pgs. 82, 157).  Nicolas was interviewed by the General Manager, Mr. Jerry Mazurowski.  (Exh. 11; pg. 88).

---

[3]     While the testimony and affidavits of the Plaintiffs, both those deposed and those who have not been deposed, along with two managers who actually interviewed and hired the Plaintiffs, stand in stark contradiction to the affidavits of two manager proffered by Defendants, Mark Cammarata and Jared Lilly, those two affidavits are inadmissible and immaterial for reasons discussed *infra*.  See also Plaintiff's Motion for Sanctions (Doc. 138).  In short, Plaintiffs contend that the affidavits of Camarrata and Lilly are barred by Fed.R.Civ.P. 30(b)(6) and 37(c).

At her initial interview, the menu, customer service, and uniform requirements were discussed, but there was no specific discussion as to what the minimum wage was, what hourly wage she would receive, what the tip credit was, or how much she would be making, after training.  (Exh. 11; pgs. 95, 97-98, 156-57).  Nicolas is certain that no specific conversation took place about the minimum wage or what her rate of pay would be per hour, but she received vague assurances that people did "well" and "not to worry."  (Exh. 11; pg. 100).  Nicolas  took the job at the Greene Turtle because she was out of work at the time, and needed income.  (Exh. 11; pg. 99).

Nicolas was trained by another Plaintiff in this case, Katie Mason, well before the "certified trainer" program existed.  (Exh. 11; pgs. 72, 79).  Nicolas recalls Mason telling her that she would be paid at a lesser rate per hour because they were making tips.  (Exh. 11; pg. 98).  During this discussion, Mason did not: (a) use the term "minimum wage"; (b) inform Nicolas as to the amount of the minimum wage; or (c) tell Nicolas what amount she would be paid when she completed training.  (Exh. 11; pg. 159).  They did not discuss that tips would be applied towards the minimum wage.  (Exh. 11; pgs. 126-27).  Mason was a co-worker, and no one in management directed Mason to discuss wages with Nicolas.  (Exh. 11; pg. 123).  Nicolas later became a CT, and she testified that it was not the responsibility of a CT to inform employees as to their compensation. (Exh. 11; pgs. 136-37).

During her employment with the Greene Turtle, Nicolas did not know the amount of the Federal minimum wage, and she did not know whether she was being paid in accordance with the minimum wage.  (Exh. 11; pgs. 160, 168-69).  Nicolas did not receive any written notice or policy from the Greene Turtle advising her as to any provision of the FLSA.  (Exh. 11; pgs. 169-70, 175). Without notice from Defendants of her right to minimum wages, Nicolas lacked knowledge of what her rights were, and she failed to report to management hours of work that she spent which went uncompensated.  (Exh. 11; pgs. 73-74; 81-82).  Nicolas only became "aware" of the tip credit

provisions of the FLSA after learning of this lawsuit, and she denied that her understanding of the tip credit provisions comes from her pay stubs. (Exh. 11; pgs. 129, 172).

### 2.  Tanesha Neal

Ms. Tanesha Neal ("Neal") is another Greene Turtle employee that the Defendants chose to depose.  Neal worked from January 23, 2008 through April 30, 2008 at the Greene Turtle BWI location. (Exh. 12; Neal Dep., pg. 8).  Neal was hired after speaking to a young woman who was the manager, and a male General Manager. (Exh. 12; pgs, 24, 26).  Neal's interview was short (15 minutes), and it centered on whether she had the requisite experience, her availability, and the menu. (Exh. 12; pgs. 26-27, 32-33).  Having previously worked at a restaurant, Neal did not ask what she would earn because she figured that she would make tips. (Exh. 12; pg. 28). Neal did not know at the time what the minimum wage rate was, and she did not ask anyone what the minimum wage rate was. (Exh. 12; pgs. 31, 73).  In fact, no one mentioned to Neal the minimum wage during the hiring process, the training process, or at any other time during her employment. (Exh. 12; pg. 73).  Neal was not told that she would receive an hourly wage in addition to receiving tips. (Exh. 12; pg. 34).  The only thing discussed at her interview about tips was what Neal would have to "tip out" to the bartenders and bussers. (Exh. 12, pg. 33)  Neal did not discuss with anyone the fact that she was receiving less than the minimum wage in pay periods when she received tips. (Exh. 12; pg. 60).  No one at the Greene Turtle mentioned the term "tip credit" in connection with her employment, and no one at the Greene Turtle ever informed her that she was receiving a tip credit. (Exh. 12; pgs. 74-76).  Prior to this case, Neal had no idea that tipped employees could be paid less than the minimum wage by their employer, or that employers could apply a part of a tipped employee's tips against an employer's minimum wage obligation. (Exh. 12; pgs. 74-75).  No one at the Greene Turtle talked with Neal about the FLSA, and she did not receive any written notices or policies which discussed subminimum wages or the tip credit during her employment

with the Greene Turtle.  (Exh. 12; pg. 75).  Neal never saw any posters with respect to the FLSA on the premises of the Greene Turtle.  (Exh. 12; pg. 77).  At the time she worked for the Greene Turtle, she did not know whether she was receiving the minimum wage, and she could not determine from her pay stubs, at the time she received them, what the minimum wage was at the time.  (Exh. 12; pgs. 76-77).

### 3.  Renata Solorzano

Ms. Renata Solorzano ("Solorzano") is another Greene Turtle employee that the Defendants chose to depose.  Solorzano worked from May 31, 2008 through February 23, 2009 for the Greene Turtle at the Verizon Center.  (Exh. 13; Solorzano Dep. pg. 9).  Solorzano was out of work at the time that she applied at the Greene Turtle, and was seeking "[w]hatever they would offer" in terms of compensation.  (Exh. 13; pgs. 27-28).  Solorzano was interviewed by Morris Bell, a manager who worked at the Verizon Center and at BWI. (Exh. 13; pg. 31 & Exh. 14; Bell Aff. ¶ 1).

The entire interview took ten minutes, and Solorzano was asked where she had worked, when she could start, and why she wanted to work there. (Exh. 13; pgs. 31-32).  No discussions concerning compensation occurred during the interview.  (Exh. 13; pg. 33).  No one at the Greene Turtle ever informed Solorzano about anything with respect to the minimum wage, and there were no FLSA posters hanging at the Verizon Center location.  (Exh. 13; pg. 78).

After training, Solorzano received a lower hourly wages but she received tips.  (Exh. 13; pg. 42,).  Like the other tipped employees at Verizon, she earned $2.80/hour from the Greene Turtle. (Exh. 13; pg. 30).  Tips were not included in the pay check, but aggregate tips for the 2-week period were referenced in the check.  (Exh. 13; pg. 46).

Over objection, Solorzano testified that the "tip credit" allows an employer to pay a lower hourly rate because tips are received.  (Exh. 13; pgs. 59-60).  Solorzano insists that the tip credit provisions of the FLSA were never brought to her attention.  (Exh. 13; pg. 61).  Asked whether

there is any "explanation" for her lower wages while receiving tips, other than the fact that the Greene Turtle was taking a tip credit, Solorzano first responded "industry standard." (Exh. 13; pgs. 60-61). Asked yet again the same question, and over objection, Solorzano responded, "I don't do their bookkeeping so I don't know what it could be." (Exh. 13; pg. 62). Asked a *third time* the same question, and over objection, Solorzano responded "I'm sure there's something out there that it could be, but I'm not--", and was cut-off by counsel for the Defendants. (Exh. 13; pgs. 62-63). Asked a *fourth* and *fifth* time the same question, and over objection, Solorzano stated that she did not know what additional explanations there could be. (Exh. 13; pg. 63). During her deposition, Solorzano pointed out that the Defendant's payroll journal exhibit contained incorrect information from that contained in her earnings statement. (Exh. 13; pgs. 52-54)

### 4. Kristin Murphy

Ms. Kristin Murphy ("Murphy") is another Greene Turtle employee that the Defendants chose to depose. Murphy worked from August 2008 through September 2010 at the BWI Greene Turtle. (Exh. 15; pg. 6). Murphy learned of a job opening at the Greene Turtle through a friend, and was interviewed by Mark Cammarata. (Exh. 15; pgs. 25, 27). However, there was no discussion of compensation at the interview, and Cammarata did not even mention the existence of a training period – Murphy learned about the training on her first day of work. (Exh. 15; pg. 29). (Murphy was not paid for some of her training at the Greene Turtle, despite complaints to Cammarata and Devito). (Exh. 15; pgs. 18-22).

Murphy was not informed by Cammarata or anyone else that her tips would be applied against the minimum wage obligations of the Greene Turtle, or that she had the right to retain all of her tips except in a valid tip pooling arrangement. (Exh. 16; Murphy Aff. ¶ 2). For example, Murphy did not know that all tips that she received were retained by her, because she was forced to "tip out" various workers including "grab-and-go girls." (Exh. 15; pgs. 55-56). Had she been put

on notice that the law requires that tips be retained except in the case of a valid tip pooling arrangement, Murphy would have and could have questioned the practice of requiring her to turn over tips paid to her from her dining customers to "grab-and-go girls" that serviced carry-out patrons. (Exh. 16; Murphy Aff. ¶ 2).

### 5. Anna Stair

Ms. Anna Stair ("Stair") is another Greene Turtle employee that the Defendants chose to depose. Stair worked at the Greene Turtle in Towson from January 23, 2007 through May 22, 2009. (Exh. 17; Stair Dep. pg. 14). During her interview Stair did not discuss compensation. (Exh. 17; pg. 25). Stair did not discuss tips in any regard at her interview, and she did not recall being told that she would receive an hourly wage plus tips, much less what exactly she would receive as an hourly wage. (Exh. 17; pgs. 25-26, 28). Like others, Stair did not understand the information printed on her pay check and did not understand how the hourly wage was calculated, or, in her words, "how that number came about or where that number came from." (Exh. 17; pg. 35). She did not ask questions regarding the compensation structure, because she did not think it would make a difference. (Exh. 17; pg. 51).

Stair had never heard of a "tip credit" until this case. (Exh. 17; pg. 50). Stair indicated that "as I understand it now," the tip credit means that part of her wages were based on tips. (Exh. 17; pgs. 16-17). Stair understands only now that that the tip credit is part of the minimum wage based on tips.

Despite not knowing about the tip credit until this case, defense counsel aggressively badgered Stair. When asked for any reason why she was receiving a lower hourly wage in certain workweeks, Stair responded that she could not explain where the numbers were coming from or why, but she speculated: "maybe they were paying us less than the minimum wage." (Exh. 8; pgs. 47). Again, the question was asked and over objection, Stair responded: "I don't know what the

Greene Turtle was doing." (Exh. 17; pg. 47). Defense counsel, evidently not satisfied with the answer to this "gotcha" question, repeated the question *four more times*, and over objection, Stair repeated that "they were paying us less than what is appeared to be minimum wage." (Exh. 17; pg. 49). Nevertheless, defense counsel badgered Stair by asking the question yet again, and Stair emphatically responded, "I can't explain what the Greene Turtle did." (Exh. 17; pg. 50).

Like other employees receiving tips, Stair was not aware what the minimum wage was. (Exh. 17; pg. 52, 64). No one from management at the Greene Turtle ever informed Stair of any wage provisions relating to the minimum wage, or State law. (Exh. 17; pgs. 64-65). Stair can recall no posters regarding the minimum wage posted at the Greene Turtle, and no employee handbook references to the minimum wage. (Exh. 17; pgs. 65, 67). At one point, Stair was forced to share tip with a manager. (Exh. 17; pgs. 53-56). No one from management at the Greene Turtle ever informed Stair of any law that might have impacted the ability of managers to share in tips. (Exh. 17; pg. 71).

### 6.  Additional Plaintiff Affiants

The Defendants did not chose any deponents who had been informed of the tip credit provisions of Section 203(m) the FLSA. Consistent with the deposition testimony of the five Plaintiffs as discussed above, various Plaintiffs from three various restaurants have all sworn: (a) that no one in Greene Turtle management ever informed them that the wages and tips which they received must at least equal the minimum wage; (b) that no one in Greene Turtle management ever informed them that the Greene Turtle was taking a credit against the minimum wage based on the tips received from customers; (c) that none of the earning statements or payroll records that they received from the Greene Turtle indicated (or otherwise led them to believe) that all or part of their tips were being applied against the minimum wage obligations of the Greene Turtle; (d) that they did not know that their tips were being applied against (or otherwise used to satisfy) the

minimum wage; (e) that no one in Greene Turtle management ever said anything to them, or provided them any written documents, concerning the FLSA or notified them of any provision of the FLSA, at any time during their employment; (f) that no one informed them, verbally or in writing, how the Greene Turtle was complying with the minimum wage requirements, or as to any provision of the FLSA, at any time during their employment; and/or (g) that no one in Greene Turtle management ever informed them that that all tips received by a tipped employee must be retained by the tipped employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips.  (Exhs. 18-31).

### D.   Testimony and Affidavits by Plaintiffs – Deductions for Customer Walk-Outs.

It is axiomatic that in order for an employer to take a tip credit, the tipped employee must be informed of the right to retain all tips, except as part of a valid tip pool.  29 U.S.C. § 203(m).

Devito admitted that she did not know whether managers told tipped employees that all or part of their tips were being applied against the minimum wage owed by the Greene Turtle.  (Exh. 1; pg. 85).  However, Devito is the corporate source for HR information, (Exh. 1; pg. 11-12), and one would certainly expect that she would be able to answer this question.

Devito denied that the Greene Turtle takes tips from their tipped employees, to cover business losses such as customer walk-outs (labeled in the industry as "hogging and jogging" or "dining and dashing").  (Exh. 1; pg. 124).  However, there is no evidence in the record that the Greene Turtle informed its tipped employees of the provisions of Section 203(m) giving them the right to retain their tips, because the Greene Turtle takes tips from their tipped employees to cover customer walk-outs.

For example, Plaintiff Solorzano testified about how she was terminated by the Greene Turtle for refusing to pay for a customer walk-out.  During a particular busy evening following a Washington Capitals game, Solorzano was serving a table that had run up a $140 bill.  (Exh. 13;

pg. 68).  The Greene Turtle's credit card system crashed, and they did not have a back up system for customers to pay their checks.  (Exh. 13; pg. 68).  The customers took a carbon copy slip with them, and security could not find them.  (Exh. 13; pg. 68).  As a result, the Greene Turtle required Solorzano to pay for the customer walk out, even though the crashed system was not her fault. (Exh. 13; pg. 68).  At the end of the night, Solorzano did not get whatever credit card tips she should have gotten.  (Exh. 13; pg. 69).  Solorzano appeared ready to work for her next shift, but she was told by management that she had to pay the customer's charge before she could work again.  (Exh. 13; pg. 69).  Ultimately, the Greene Turtle took Solorzano off the schedule after she refused to pay for the walk-out, effectively terminating her employment.  (Exh. 13; pg. 69).

Solorzano was not the only Plaintiff required to pay for a customer walk-out.  Plaintiff Richard Wainwright actually paid from his tips $76.00 for a customer walkout.  (Exh. 30).  After Wainwright appealed to the General Manager, Rick Clagett, to "comp" the check, Clagett told Wainwright "that it was my f___ing fault and this is what you get."  (Exh. 30; ¶ 6).   A manager, Morris Bell, confirms that it was the policy of the Greene Turtle to require tipped employees to cover customer walk outs, and that such charge backs would hurt the profit/loss statement for the bar, thereby resulting in lower management bonuses.  (Exh. 30; ¶ 9).

This policy was not unique to the Verizon Center.  Kathleen Charnigo, another Plaintiff in this case who worked for many years at the Towson location (2006-2010), has averred that at least once a week, there would be a "customer walk-out," and it was understood that managers would not void open checks where there was a customer walk-out.  (Exh. 23; ¶ 9).  As a result, Charnigo had to pay the Greene Turtle and cover these customer walk-outs with her own tips.  (Exh. 23; ¶ 9).

IV.     Summary Judgment Argument

As discussed below, Defendants fail to satisfy their burden of proving that the Plaintiffs were informed of the provisions of Section 203(m) of the FLSA.  Because the Defendants fail to satisfy that burden, Plaintiffs are entitled to partial summary judgment on Counts I, II, and V of the Fourth Amended Complaint.

A.   Overview of the Requirements of Section 203(m) of the FLSA.

Section 203(m) of the FLSA defines the term "wage."  29 U.S.C. § 203(m).   Section 2105 of Title II of the Small Business Job Protection Act of 1996 ("SBJPA"), Public Law 104-188, 100 Stat. 1755, amended, inter alia, 29 U.S.C. § 203(m), by providing that:

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on the date of the enactment of this paragraph; and (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under Section 6(a)(1). The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the *provisions of this subSection*, and all tips received by such employee have been retained by the employee, except that this subSection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Public Law 104-188, § 2105(b) (1996) (italics added). Prior to the 1996 amendments, Section 3(m) of the FLSA required an employer to pay its tipped employees a cash wage equal to 50 percent of the minimum wage (then $4.25 an hour). See Public Law 101-157, § 5 (1989). As amended, Section 3(m)(1) provides that an employer's minimum cash wage obligation to its tipped employees is the minimum cash wage required on August 20, 1996, the date of the SBJPA's enactment. Thus, Section 3(m)(1) established an employer's minimum cash wage obligations to

tipped employees at the pre-SBJPA amount: 50 percent of the then-minimum wage of $4.25 per hour, or $2.13 per hour.[4] See 29 U.S.C. § 203(m)(1).

Subsection (2) of the 1996 SBJPA bases an employer's maximum allowable tip credit on a specific formula in relation to the applicable minimum wage, stating that an employer may take a tip credit equal to the difference between the required minimum cash wage specified in paragraph 3(m)(1) ($2.13) and the minimum wage ($7.25 effective July 24, 2009). Thus, the maximum Federal "tip credit" that an employer currently is permitted to claim under the FLSA is $7.25 minus $2.13, or $5.12 per hour.

According to the DOL:

The 'provisions of this subsection' include how to determine the wage an employer is required to pay a tipped employee, which is "the amount paid such employee by the employee's employer" (an amount that cannot be less than the cash wage required to be paid to a tipped employee on August 20, 1996, which was $2.13), and "the additional amount on account of the tips received by such employee" (an amount equal to the difference between the actual cash wage paid and the full minimum wage in effect under Section 6(a)(1) of the Act). A Senate Report accompanying the 1974 amendments stated that the amendment "modifies Section 3(m) of the [FLSA] by requiring employer explanation to employees of the tip credit provisions, and by requiring that all tips received be paid out to tipped employees. * * * The tip credit provision of S. 2747 is designed to insure employer responsibility for proper computation of the tip allowance and to make clear that the employer is responsible for informing the tipped employee of how such employee's wage is calculated. Thus, the bill specifically requires that the employer must explain the provision of the Act to the employee and that all tips received by such employee must be retained by the employee." S. Rep. No. 93-690 at 42-43 (1974) (emphasis added).

Updating Regulations Issued Under the Fair Labor Standards Act, 76 FR 18832, 18843 (Apr. 5, 2011) (alterations in original).

The DOL has concluded, "based on the express provisions of the statute and the

---

[4]   As observed by Judge Lamberth in <u>Ventura et al. v. Bebo Foods, Inc., et al.</u>, 738 F.Supp.2d 8, 16 (D.D.C. 2010), although tipped employees must still receive the federal minimum wage set forth in 29 U.S.C. § 206(a), an employer need only pay its tipped employes (under the FLSA) $2.13 per hour, provided the employer complies with the provisions of 203(m). <u>Ventura</u>, 738 F.Supp.2d at 16. The difference between the minimum wage and the wages an employer pays its tipped employees is known as a "tip credit." <u>Id.</u>

supporting legislative history," that:

> an employer must inform a tipped employee before it utilizes the tip credit, of the following: (1) The direct cash wage the employer is paying a tipped employee, which can be more than, but cannot be less than, $2.13 per hour; (2) the additional amount the employer is using as a credit against tips received, which cannot exceed the difference between the minimum wage specified in Section 6(a)(1) of the FLSA and the actual cash wage paid by the employer to the employee; (3) that the additional amount claimed by the employer on account of tips as the tip credit may not exceed the value of the tips actually received by the employee; (4) that the tip credit shall not apply with respect to any tipped employee unless the employee has been informed of the tip credit provisions of Section 3(m) of the Act; and (5) that all tips received by the tipped employee must be retained by the employee except for the pooling of tips among employees who customarily and regularly receive tips.

76 FR at 18844.

The DOL further observed that "the current FLSA recordkeeping regulation, at 29 CFR 516.28(a)(3), expressly requires that the amount per hour that the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week." Id.

On May 5, 2011, the DOL issued its final regulation, which provides in part the requirements which an employer must satisfy in order to take a credit of tips against its minimum wage obligation:

> … Pursuant to Section (3) [29 U.S.C. § 203(m)], an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of Section 3(m) of the Act, i.e.:

> > The amount of the cash wage that is to be paid to the tipped employee by the employer;

> > the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee;

> > that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips;

> > and that the tip credit shall not apply to any employee who has not been informed

of these requirements in this Section.

The credit allowed on account of tips may be less than that permitted by statute (minimum wage required by Section 6 (a)(1) [29 U.S.C. § 206(a)(1)] minus $2.13); it cannot be more. In order for the employer to claim the maximum tip credit, the employer must demonstrate that the employee received at least that amount in actual tips. …

29 C.F.R. § 531.59(b).[5]

Various Courts of Appeals that have addressed the inform requirements of Section 203(m) have rendered it clear that an employer of tipped employees must "fully inform" its employees of the provisions of Section 203(m).  <u>Richard et al. v. Marriott Corporation, et al.</u>, 549 F.2d 303, 305 (4th Cir. 1977) ("What Congress has said, in effect, to restaurant employers is that, if you precisely follow the language of 3(m) and *fully inform* your employees of it, you may obtain a 50 percent credit from the receipt of tips toward your obligation to pay the minimum wage.  The collorary seems obvious and unavoidable: if the employer does not follow the command of the statute, he gets no credit.") (italics added).  Courts have required, at a minimum, that an employer notify an

---

[5]    While recognizing the existence of newly revised 29 C.F.R. § 531.59 (2011), the Defendants maintain that these "new Regulations do not apply to this case because no Plaintiff has worked for the Restaurants since October 2010." (Doc. 137-2, pg. 18).  The Defendants cite to 29 C.F.R. § 531.59 (2009), implying that that regulation controls this case.  (Doc. 137-2, pg. 19 n. 7).  But this argument is meritless, because the regulation cited by the Defendants was promulgated in 1967, one year after the tip credit was first introduced and prior to the 1974 amendments to the FLSA which first added the "inform" provisions of the FLSA.  <u>See</u> 76 F.R. at 18838.  The DOL first proposed updating this outdated regulation in 2008.  See 73 FR 43654, 43659-60 (July 28, 2008) (proposing to update the regulation to "incorporate the 1974 amendments, the legislative history, subsequent court decisions, and the Department's interpretation.") While retroactive application of a regulation is generally not favored, the Fourth Circuit has retroactively applied amended DOL regulations under similar circumstances.  <u>See</u> <u>Whiting v. The Johns Hopkins Hosp.</u>, 416 Fed.Appx. 312, 314 (4th Cir. 2011) (affirming Judge Quarles's decision in <u>Whiting v. John Hopkins Hosp.</u>, 680 F.Supp.2d 750 (D. Md. 2010), retroactively applying a FMLA regulation).  In <u>Whiting</u>, the Fourth Circuit determined that an FMLA regulation was "clarifying," and thus could be applied retroactively, by "considering the intent of the body that enacted the amendment."  <u>Whiting</u>, 416 Fed.Appx. at 314.  The <u>Whiting</u> Court looked to the regulation's preamble in deciding that it was "clarifying." <u>Id.</u>  In the underlying decision, Judge Quarles had likewise reasoned that the subsequent revision to the existing regulation was "not a change in the law but a clarification of what the law has been since the original version of the section was promulgated… ."  <u>Whiting</u>, 680 F.Supp.2d at 745.  Here, Defendants cannot possibly claim that a pre-1974 regulation they cite is applicable to this case, as the proposed revisions to § 531.59 were issued in 2008, see 73 FR at 43668.  The 2011 final regulation merely clarified "the express provisions of the statute and the supporting legislative history."  76 FR at 18844.  With no change in the law, the new regulation may be applied here.

employee of its intention to treat tips as satisfying part of the employer's minimum wage obligations. See Martin v. Tango's Restaurant, Inc., 969 F.2d 1319, 1322 (1st Cir. 1992) ("We read Section 3(m) to require at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations.  It could easily be read to require more – for example, notice of 'the amount … determined by the employer' to constitute wages – but how much more need not be decided in this case."); see also Reich v. Chez Robert, Inc., 28 F.3d 401, 403-04 (3rd Cir. 1994) ("Section 3(m) therefore allows an employer to reduce a tipped employee's wage below the statutory minimum by an amount to be made up in tips, but only if the employer informs the tipped employee that her wage is being decreased under Section 3(m)'s tip-credit provision" and further stating that "[t]he notice requirement is a firm one"); Kilgore v. Outback Steakhouse of Florida, Inc., 160 F.3d 294, 298 (6th Cir. 1998) ("[A]n employer must inform the employee that it intends to treat tips as satisfying part of the employer's minimum wage obligation."); Barcellona v. Tiffany English Pub., Inc., 597 F.2d 464, 467 (5th Cir. 1979)

"Courts have interpreted [this] provision to require that an employer 'satisfy two conditions: (1) inform the employee of the 'tip credit' provision of the FLSA, and (2) permit the employee to retain all of the tips the employee receives' to qualify for the tip credit."[6]  Compantilla et al. v. Fiskardo Estiatorio, Inc., 788 F.Supp.2d 253, 287 (S.D.N.Y. 2011) (citations omitted); see also Dominguez v. Quigley's Irish Pub, Inc., 790 F.Supp.2d 803, 818 (N.D. Ill. 2011).  It is not enough that an employee is *aware* of the tip credit provisions of the FLSA; rather, Section 203(m) affirmatively requires employers *to inform* employees of the provisions contained in Section

---

[6]  Some courts have said that an employer may take the tip credit if it: (1) pays a cash wage of at least $2.13 an hour; (2) informs its employees of the FLSA's tip credit provisions; (3) permits its employees to retain tips; and (4) ensures that the cash wage plus tip credit equal at least the minimum wage each week.  See, e.g., Chisolm v. Gravitas Rest. Ltd., 2008 WL 833760, *2 (S.D. Tex. 2008).  Regardless of how this Court counts the element of Section 203(m), the undisputed evidence shows that Defendants cannot satisfy any of the tests required before an employer can take advantage of the tip credit provisions of FLSA.

203(m).  Pedigo v. Austin Rumba, Inc., 722 F.Supp.2d 714, 724 (W.D. 2010).

**B. Defendants' Claim That They Verbally Inform Employees Is Insufficient Evidence For Purposes Of Obtaining Summary Judgment Over Plaintiffs.**

Defendants first erroneously claim as "undisputed facts," is that the Plaintiffs were informed either "verbally or in writing (or both)." (Doc. 137, pg. 2).  Attaching affidavits of two former managers, Cammarata and Lilly, Defendants boldly conclude that the affidavits "sink Plaintiffs' claims."  Not only are Defendants' statements patently wrong, but they are another example of Defendants' use of skeletal arguments.[7]

With respect to the Lilly affidavit, the undisputed facts demonstrate that Lilly didn't interview a single Plaintiff at Verizon.  (Exh. 24).  Only one Plaintiff at Verizon, Malikah Hassan, was hired during Lilly's employment between July 2009 and September 2010 (Affidavits of Plaintiffs all indicate that they were not hired by Lilly and/or never even met him), and Hassan was a bartender.  (Exh. 24).  Lilly's own affidavit states that he did not hire bartenders.  (Doc. 137-12; ¶4).  Therefore, there is no dispute that Lilly **failed to inform** a single Verizon Plaintiff anything about Section 203(m) of the FLSA.

Cammarata's affidavit similarly fails to provide sufficient and *particularized* evidence, based on personal knowledge, that he informed any specific Plaintiffs at the BWI Greene Turtle of the provisions of 203(m).  (He only refers to Craig Dorsey, and even then, cautiously states "I

---

[7]      Plaintiffs have previously complained about the strategy of Defendants relying on skeletal arguments.  (Doc. 132, pg. 9 n. 1).  They must believe that either their own evidence is not worthy of analysis, or that the Court will construct an argument for them.  See McWilliams v. McWilliams, 2006 WL 3775952, *1 (N.D. Ill. Dec. 19, 2006) (citations omitted).  "Judges are not like pigs hunting for truffles, and "it is not a judge's responsibility to research and construct the parties arguments."  Id. at *2.

believe").[8]   Aside from being woefully inadequate to satisfy Defendants' burden of proving that

each of the BWI Plaintiffs was informed of the tip credit requirements, there is no reference to what

occurred at the Towson Greene Turtle, leaving it only to the reader's imagination what actually

occurred there.[9]   Cammarata's affidavit appears to be a back-door introduction of "habit evidence"

under Rule 406.   However, habit evidence has "strict requirements," in order to be deemed

admissible.   Wilson v. Volkswagon of America, Inc., 561 F.2d 494, 511 (4th Cir. 1977).   As the

Fourth Circuit has specifically stated:

> It has been repeatedly stated that habit or pattern of conduct is never to be lightly
> established, and evidence of examples, for purpose of establishing such habit, is to be
> carefully scrutinized before admission.  The reason for such an attitude toward evidence of
> habit is the obvious danger of abuse in such evidence resulting from "the confusion of
> issues, collateral inquiry, prejudice and the like," or, as one court has phrased it, "the
> collateral nature of (such) proof, the danger that it may afford a basis for improper
> inferences, the likelihood that it may cause confusion or operate to unfairly prejudice the
> party against whom it is directed * * *."  It is only when the examples offered to establish
> such pattern of conduct or habit are "numerous enough to base an inference of systematic
> conduct" and to establish "one's regular response to a repeated specific situation" or, to
> use the language of a leading text, where they are "sufficiently regular or the
> circumstances sufficiently similar to outweigh the danger, if any of prejudice and
> confusion," that they are admissible to establish pattern or habit. In determining whether
> the examples are "numerous enough" and "sufficiently regular," the key criteria are
> "adequacy of sampling and uniformity of response," or, as an article cited with approval in
> the Note to Rule 406, Federal Rules of Evidence, puts it, on the "adequacy of sampling"
> and the "ratio of reactions to situations."   These criteria and this method of balancing
> naturally follow from the definition of habit itself as stated in the Model Code of Evidence:
> "Habit means a course of behavior of a person regularly repeated in like circumstances."
>
> While precise standards for measuring the "extent to which instances must be multiplied
> and consistency of behavior maintained in order to support an inference of habit and
> pattern of conduct, cannot be formulated," it is obvious that no finding is supportable under
> Rule 406, Federal Rules of Evidence, which fails to examine critically the "ratio of reactions

---

[8]      Cammarata's averment about Dorsey is similar to inadmissible statements based on "information
and belief" that the person believes are true but does not personally know.   Cammarata's statement "I
believe that I" had discussed the method of payment with Dorsey is not the equivalent of "I know that I . . . "
It is thus improper and inadmissible for purposes of Summary Judgment.   See Automatic Radio Mfg. Co. v.
Hazeltine Research, 339 U.S. 827, 831 (1950); Hicks v. Baines, 593 F.3d 159, 167 (2d Cir. 2010).
[9]      Cammarata's affidavit does not indicate that he interviewed, hired, or even spoke to a single
employee at the Towson Greene Turtle.   In stark contrast, the affidavits of Plaintiffs Stonesifer, Mason,
Charnigo, and White speak for themselves.   (Exhs. 26, 23, 20, respectively).

to situations."  Necessarily, as we have seen, regularity of conduct such as that charged against defendants requires some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place. No such comparison was made or attempted in this case.

Id. at 511-12 (footnotes omitted).

In this case, Defendants do not even attempt to submit an "adequacy of sampling and uniformity of response," or the "adequacy of sampling" and the "ratio of reactions to situations," as required to establish the admissibility under Rule 406 of the outlandish claim that it was the Defendants' routine practice to inform applicants that their "base wage rate would be reduced below the minimum wage after the training period and that they would make up the balance of their income through tips that they earned."  (Doc. 137-11, ¶ 6); Volkwagon of America, supra.  The Cammara and Lilly affidavits certainly do not prove or even intimate how they disclosed wage and tip practices in a "semi-automatic" fashion in the given situation, nor do they establish that applicants were informed in any routine manner.  Cammarata even admits that discussions of how "minimum wage and tips worked to supplement one another" occurred in response to an applicant's question.  (Doc. 137-11, ¶ 7).  While there are no "precise standards" for determining the sufficiency for habit, it cannot be maintained that affidavits of two former managers, out of the scores of possible managers employed by the Greene Turtle over the relevant time period (Exh. 32), describing how Defendants' management allegedly personally conducted interviews, nor are two affidavits numerous enough to establish "one's regular response to a repeated specific situation."  See Wilson, 561 F.2d at 511-12.  Rather, the generalized and non-specific accounts of two managers are such a small "ratio of reactions to situations," that it is patently clear that they do not and could not establish habit evidence.

This is particularly true, given the specific accounts of two former managers, Jeremy Scarborough and Morris Bell, who expressly deny that they were trained to inform applicants or

employees with respect to anything about the provisions of Section 203(m). (Exhs. 14 & 13). Moreover, the materials used to train managers contain nary a hint as to any instruction by the Defendants to inform applicants and/or employees of the provisions of Section 203(m). Finally, the Plaintiffs' own deposition testimony, along with the affidavits of Plaintiffs who were not deposed, refute any notion that the Plaintiffs, or anyone else employed by Defendants, were informed that their tips would be applied against the Defendants' minimum wage obligations (or about any other provision of 203(m)).[10] No Plaintiff was informed of the minimum wage and no one used such terminology with the Plaintiffs.

Finally, the affidavits of Cammarata and Lilly are inadmissible as they represent the exact form of bandying which Fed.R.Civ.P. 30(b)(6) was designed to cure. Plaintiffs incorporate herein the arguments set forth in their Motion for Sanctions (Doc. 138).[11]

### C. Defendants' Argument That The Deposed Plaintiffs Admitted Receiving A "Tip Credit" Is Insufficient Evidence To Establish That the Defendants Complied With the Notice Provisions of Section 203(m) of the FLSA.

The issue at Summary Judgment is not whether a Plaintiff, untrained in the law and certainly not informed of the provisions of 203(m), can explain the payroll practices of the Greene Turtle. The issue is whether the Defendants present undisputed facts that they informed the Plaintiffs, *before taking a tip credit*, of the provisions of 203(m). Accordingly, it is crystal clear that

---

[10]     Plaintiff Gina Sabella ("Sabella") does aver that she was told that she would get paid at a certain wage rate and receive tips, but nothing was said to her about the training wage or the intent of the Defendants to apply her tips against the Defendants' minimum wage obligation. (Exh. 19) Thus, what was said to Sabella did not satisfy the provisions of section 203(m).

[11]     Defendants appear to take some glee in the fact that Plaintiffs did not pursue three manager depositions. (Doc. 137-2; pg. 8 (alleging, *incorrectly*, that Hoffman spoke to Cammarata and then decided not to depose any managers). However, the Plaintiffs can justifiably rely on a 30(b)(6) deposition and the Interrogatories incorporating Devito's testimony. In any event, the Court should keep firmly in mind that the burden is on Defendants to *prove* that their tipped employees were informed of the provisions of section 203(m) before taking a credit for tips against their minimum wage obligations. The burden is not on the Plaintiffs to *disprove* notification. Indeed, Defendants efforts to shift the focus of their Motion away from Defendants' total failure to carry their burden is a tacit recognition that they are not entitled to Summary Judgment.

Defendants are **not** entitled to Summary Judgment.

Defendants' misleading argument that each of the deposed Plaintiffs admitted that they were informed in writing of the tip credit provisions of Section 203(m) is without merit, as it relies on four faulty premises.   The four false premises are: (1) the only inference that an employee can draw from the changing pay rates (from training to server) is that the Greene Turtle takes a tip credit pursuant to Section 203(m); (2) that an employee's present day acknowledgment in a deposition can serve as evidence of Defendants' compliance with Section 203(m) when the employee was employed by the Greene Turtle; (3) that an employee's *awareness* of the tip credit provisions is the equivalent of his/her being *informed by the employer* of the tip credit provisions of the FLSA; and (4) that the deposition questioning was proper and that cited responses constitute admissible evidence for purposes of Summary Judgment.   These contentions will be discussed in turn, below:

> 1. **Employees Cannot Infer From Their Pay Stubs That Defendants Were Relying on and Crediting Employees' Tips Towards Defendants' Minimum Wage Obligations.**

Plainly, the pay stubs relied upon by Defendants say nothing about the tip credit, or the amount of tips being credited against the minimum wage.  (Doc. 137-13, Exh. 10).  It is undisputed, then, that Defendants violate 29 C.F.R. § 516.28(a)(3), which expressly requires that the amount per hour that the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week.   Thus, it cannot be maintained that the only inference which may be drawn from the four corners of the pay stubs, payroll journals, earning statements, etc., is that the Defendants are applying an employee's tips against their minimum wage obligations.   Accordingly, Defendants' reliance on paystubs falls far short of the standard to fulfill the notice obligation articulated by the Courts of Appeals, which have uniformly "require[d] at the very least notice to employees of the employer's intention to treat tips

as satisfying part of the employer's minimum wage obligations." <u>Tango's Rest.</u>, 969 F.2d at 1322, <u>Kilgore</u>, 160 F.3d at 298, <u>Chez Robert</u>, 28 F.3d at 403.  It is logically incorrect that the only possible inference that could be drawn from the pay stubs (and the change in wage rates from training to serving), inexorably lead to the conclusion that an employer was taking a tip credit.  Generic pay stubs, such as the ones provided by the Defendants to the Plaintiffs, (Doc. 137-13, Exh. 10), could conceivably inform employees as to their hourly rate of pay, including the fact that tips were included with wages for tax purposes, but these documents could not possibly inform employees that their employers intended to take the tip credit with respect to their hourly rate.  Given the "strictly construed" nature of the notice requirement, <u>see</u> <u>New Silver Palace Rest</u>., <u>supra</u>, Defendants' evidence is insufficient to create a triable issue of fact as to whether the notice requirement was satisfied, as it compels only the conclusion that the tipped employees reported their tips and received a certain hourly wage.

The pay stubs **do not** provide circumstantial notice of the provisions of Section 203(m), because employers must give notice of *all of the* provisions of Section 203(m) in order to take a tip credit – and cannot avail themselves of a tip credit by merely advising employees that they will receive an hourly wage plus tips.  <u>Copantitla</u>, 788 F.Supp.2d at 288 (rejecting employer's argument that Section 203(m) is satisfied if an employer informs its employees that they would receive an hourly rate plus tips); <u>Bernal v. Vankar Enterprises, Inc.</u>, 579 F.Supp.2d 804, 809 (W.D. Tex 2008) (rejecting argument that pay stubs with hours worked, hourly wage ($2.13/hr), total amount of tips receive, gross income, taxable income, and amounts withheld, disclosed as a matter of law an employer's intention to inform employees of the provisions of Section 203(m)).  How employees could infer the provisions of Section 203(m) from their paychecks, when Devito admits that she never heard of the "tip credit" until this lawsuit (Exh. 1; pg. 90), is also left unexplained. Defendants' assertion regarding the effect of providing pay stubs to employees would completely obliterate the

notification provisions imposed by Section 203(m). That statute, legislative history, and clear case law does not permit such a result.

Even the Defendants **admit**, in terms of their own actions, that the pay stubs do not provide circumstantial notice of the provisions of Section 203(m). Defendants admit that they began posting the DOL FLSA poster and changed their employee handbook, *only after* this lawsuit was filed. The dissemination of documents and the posting of a notice demonstrate how easy it is for an employer to take steps to comply.[12]

Finally, the undisputed *admissible* evidence establishes that the Plaintiffs were not advised as to the then-current minimum wage rates. While Defendants may quarrel over whether Section 203(m) requires an employer to disclose the minimum wage rate, an employee cannot infer that his/her employer is taking a tip credit and paying a sub-minimum wage, when he/she has not been informed of the then-applicable minimum wage. It was simply not possibly to infer that their tips were being used to satisfy the minimum wage. Indeed, a tipped employee would more likely infer that the subminimum wage payment **was** the minimum wage, or that there was no minimum wage requirement for tipped employees. It is difficult to understand how, if the Defendants are not complying with the "broader responsibility of the employer to inform employees of the minimum wage provisions more generally," how they can possibly satisfy the more specific tip credit notice provisions under Section 203(m)?

---

[12]    Defendants appear to assume that their May 2010 employee handbook brought them into compliance with the tip credit provisions of Section 203(m). However, Plaintiffs do not concede that the Defendants have ever complied with the provisions of Section 203(m), even after this lawsuit was filed. For example, disseminating the DOL FLSA poster does not inform employees that their employers intend to take the tip credit. Copantitla, 788 F.Supp.2d at 289 & n.15 ("A generic government poster could inform employees that minimum wage obligations exist, but could not possibly inform employees that their employers intend to take the tip credit with respect to their salary.") And the records indicate a total absence of any copy of the MWHL poster. Moreover, the DOL FLSA poster cannot be relied upon as compliance for the notification requirements of the MWHL, as the provisions are different.

2.   Post-Hoc Analyses and Opinions During A Deposition Do Not Establish That The Defendants Informed The Plaintiffs *Prior to* Taking A Tip Credit.

Defendants' counsel's "gotcha" questions assume incorrectly that an employee's ability to analyze the changing pay rates and answer the line of questioning during a deposition, is circumstantially relevant to what the employee knew several years previously.  This is but another instance of Defendants trying to distract the focus away from their failure to comply with their notification obligations under Section 203(m).

The undisputed testimony in this case is that the employees only learned of the tip credit provisions of the FLSA through this lawsuit, not during their employment.  A Plaintiff's post-hoc supposition about the Defendants' *intent* to comply with the FLSA and MWHL does not establish that the employee was *informed* of the provisions of Section 203(m) before a tip credit was taken.[13] The line of questioning relied upon by Defendants does not logically establish that: (a) the Plaintiffs knew, during their employment, what the minimum wage was; (b) that the Plaintiffs knew, during their employment, that a minimum wage law even existed; (c) that the Plaintiffs knew, during their employment, that minimum wage laws even applied to them, or tipped employees generally; and (d) that the Plaintiffs knew, during their employment, that they were receiving a sub-minimum wage (the Plaintiffs may have believed that the sub-minimum wage that they were receiving *actually was* the minimum wage).  In sum, the Defendants' questioning of Plaintiffs, and their cited responses, do not establish, either directly or circumstantially, that the Defendants *informed* the Plaintiffs as to the provisions of Section 203(m).

3.   An Employee's General Awareness Of The Tip Credit Provisions Is Not The Legal Equivalent of Being Informed "By The Employer" Of The Tip Credit Provisions Of The FLSA Or That The Employer Even Is Using Them.

---

[13]      An employer cannot take a retroactive tip credit.  See Solis v. Min Fang Yang, et al., 345 Fed.Appx. 35, 38 (6th Cir. 2008).

The third faulty premise underlying Defendants' use of Plaintiffs alleged acknowledgments, is that an employee's alleged general awareness of the tip credit provisions in a non-descript pay stub showing nothing but varied pay rates, is sufficient evidence that the Defendants *informed* the Plaintiff of the provisions of Section 203(m).   "[T]he problem with Defendant's argument is that 203(m) does not require employees to be *aware of* the tip credit provisions.   Rather, Section 203(m) affirmatively requires employers *to inform* employees of the provisions contained in Section 203(m)."   Pedigo v. Austin Ramba, Inc., 722 F.Supp.2d 714, 724 (W.D. Tex. 2010); see also Bernal v. Vankar Enterprises, Inc., 579 F.Supp.2d 804, 809 (W.D. Tex. 2008) ("if we were to permit Defendants to substitute their statutory responsibility for an alleged general awareness of an industry-wide practice, the notice prerequisite of Section 203(m) would be satisfied in every instance, and Section 203(m) would be rendered mere surplusage.").

It is not an employee's role to determine/admit/acknowledge whether or not their pay stubs, containing changing wage rates and reported tips, by themselves, satisfy the inform requirements of Section 203(m).   The facts control a case, not an employee's acknowledgment as to what the employer appears to have attempted to do (take a tip credit), in response to classic "gotcha" questions by counsel.   The snippets of Plaintiffs' testimony selectively chosen by Defendants are immaterial, because they only serve to demonstrate the Plaintiffs' *awareness* of the tip credit provisions of the FLSA generally, not what the employer *informed* them of the tip credit provisions.   For example, where in the pay stubs does it say that a tipped employee has the right to retain all tips, except as part of a valid tip pool?   This information is required by Section 203(m), but surely the Plaintiffs' "acknowledgment" does not extend so far as to identify this provision of Section 203(m) in their pay stubs.   In any event, an employee's acknowledgment that he/she received satisfactory information regarding the provisions of Section 203(m) is no more

authoritative than an employee's acknowledgment that because he/she received a salary, the employee must be exempt from the FLSA's overtime provisions.

What matters is what employees were told *by Defendants*, and under the plain terms of Section 203(m), they must be informed by Defendants during their employment by the Greene Turtle, and not after the fact by virtue of the Court approved notice in this case, or anything that they learned as part of their participation in this lawsuit.   The only evidence (as opposed to Defendants' surmise) is that the Plaintiffs learned of some of the select provisions of Section 203(m) *after* their employment ceased and after this lawsuit began.   Whether an employer informs an employee of the provisions of Section 203(m) is a mixed question of law and fact.   Under both the facts and applicable law, Defendants' proof (not speculation) is left wanting and plainly insufficient.

### 4.   The "Gotcha" Deposition Passages Are Inadmissible For Purposes of Summary Judgment.

The Defendants erroneously assume that Plaintiffs' responses to "gotcha" questions constitute admissible evidence.   In making their assumption, Defendants ignore Plaintiffs' proper and well-founded objections to Defendants' "gotcha" lines of questions. In every instance in which the "do-you-have-any-other-explanation" question was asked by defense counsel, it was objected to by Plaintiffs' counsel.

Plaintiffs incorporate by reference the arguments set forth in their Motion to Exclude Certain Deposition Testimony and Request for The Court to Rule on The Admissibility of The Evidence.   (Doc. 138).   Aside from the fact that lay opinion witnesses cannot answer ultimate questions of law (and thus, the Plaintiffs cannot render an opinion as to whether the provisions of Section 203(m) were satisfied in this case by virtue of changing pay rates in a pay stub), the cited Sections of the deposition transcripts contain startling instances in which the Plaintiffs were asked

the same question over and over, until defense counsel received the answer that he apparently

was looking for.  While defense counsel was overly insistent with all of the deponents, Plaintiffs

Solorzano and Stair in particular were badgered to the point of harassment.  (Exh. 13; pgs. 59-63 &

Exh. 17; pg. 46-50).

Not only did these repeated questions badger and harass the witnesses, but they called for

the Plaintiffs to speculate and apply a lay definition of the tip credit provisions of the FLSA to their

pay stubs.   The questioning takes advantage of a lack of legal knowledge on the part of the

Plaintiffs (caused, in no small measure, by the Defendants' failure to provide the Plaintiffs with a

copy of Section 203(m), or inform them about it), and then proceeds to ask the witnesses to apply

an erroneous legal definition.   Thus, there was a lack of a proper foundation for these "gotcha"

lines of questions.  See generally Rifkind v. Superior Court of Los Angeles County, 22 Cal. App. 4th

1255, 1262 (2nd Dist., 4th Div. 1994) (disapproving of legal contention deposition questions, stating

"legal contention questions require the party interrogated to make a 'law-to-fact application that is

beyond the competence of most lay persons' " and that "[e]ven if such questions may be

characterized as not calling for a legal opinion, or as presenting a mixed question of law and fact,

their basic vice when used at a deposition is that they are unfair.  They call upon the deponent to

sort out the factual material in the case according to specific legal contentions, and to do this by

memory and on the spot.  There is no legitimate reason to put the deponent to that exercise.");

accord Lance, Inc. v. Ginsburg, 32 F.R.D 51, 53 (E.D. Pa. 1962) (Disapproving of legal contention

questions in depositions of lay witnesses, stating that "[t]o be sure, the client presumably knows the

facts (although not always), but he can hardly be expected to know their legal consequences," and

holding that such questions should be reserved for interrogatories).

Alternatively, and to the extent the questions are admissible, the record demonstrates that

the Plaintiffs *did* provide defense counsel with explanations.   For example, Solorzano first

explained that the changing pay rates could be the product of industry standard. (Exh. 13; pg. 61). She further insisted that she did not do their bookkeeping and could not explain their practices. (Exh. 13). Ms. Neal likewise first stated that she did not know. (Exh. 12; pg. 59). Ms. Stair responded that maybe the Defendants were simply paying less than the minimum wage – a perfectly appropriate explanation except that defense counsel did not like it, so he persisted repeatedly until she responded "I can't explain what the Greene Turtle did," (Exh. 17; pg. 50), which is an answer that does not establish the proposition cited by Defendants.

### D. Ashton Nicolas Was Not Informed By Her Employer of the Provisions of Section 203(m).

Section 203(m) requires an "employer" to inform a tipped employee of the provisions of Section 203(m). Defendants argue that the "Restaurant" informed Nicolas of the provisions of Section 203(m). (Doc. 137-2, pg. 8). Defendants' claim lacks candor or adequate proof.

Nicolas was trained by a co-worker (and fellow Plaintiff), Katie Mason. There is an absence of evidence submitted by Defendants that Mason satisfies the definition of an employer per the definition in 29 U.S.C. § 203(d). Defendants leave it to the imagination how Ms. Mason could be defined as an employer. Plaintiffs present substantial proof that she was not. Mason did not have any management authority whatsoever at the time she was training Nicolas and thus her alleged statements cannot be imputed to the Defendants. (Exh. 31; Mason Aff. ¶ 4; Exh. 25 Kelly Aff. ¶ 2) There is no evidence that Mason was directed by the Defendants to say anything whatsoever about wages to Nicolas; Devito testified as much. (Exh. 31; Mason Aff. ¶ 3). Mason was not even a "CT" (certified trainer, explained <u>supra</u>) at the time the alleged statement was made. The "CT" training program had not even been developed at the time the alleged statement was made. (Exh. 31; Mason ¶ 3 & Exh. 11; 72, 79). But even after the CT program being

developed, CTs were not responsible for discussing wages and tips with co-workers.[14]  The CT training manual provided no instruction to discuss wages and tips with co-workers.  See (Exh. 3).

But even if Mason could somehow be defined as an employer, she still failed to inform Nicolas as to all of the provisions of Section 203(m), including her right to retain tips.   Thus, Summary Judgment is not appropriate as to Nicolas (or any other Plaintiff, for that matter).

E.   Plaintiffs Must Be Granted Partial Summary Judgment.

Because the undisputed *admissible* evidence is that the Plaintiffs were not notified of the provisions the FLSA and MWHL that allow the Defendants to rely on the tips received by the Plaintiffs as a credit against the Defendants' minimum wage obligations under both the FLSA and MWHL, and because it is undisputed that the Plaintiffs all received a base pay rate which was below the then-applicable minimum wage rate, partial Summary Judgment can and should be entered as to Plaintiffs' Federal and MWHL tip credit claims.  Copantitla, 788 F.Supp.2d at 290; Austin Rumba, 722 F.Supp.2d at 726 ("For all of the above reasons, Defendant has failed to carry its burden of proving that it informed Plaintiffs of the provisions contained in Section 203(m) of the FLSA. As interpreted by the Supreme Court, the summary judgment standard of review mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and upon which that party will bear the burden of proof at trial.' [Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986)]  Accordingly, Plaintiffs are entitled to summary judgment on this issue.").

Analytically, in a tip credit case such as this, "at the summary judgment stage, Plaintiffs must merely point out that the evidence in the record is insufficient to support Defendants'

---

[14]      If CTs trained through the training program were not instructed to inform employees of the provisions of Section 203(m), then a fortiori, it is unclear how a server – uninformed of the provisions of Section 203(m) herself (Exh. 31) – could or would be in the position to satisfy the Defendants' obligations to inform Nicolas of the provisions of Section 203(m).

entitlements to tip credits.   If the Plaintiffs can satisfy this initial burden, Defendants must demonstrate that summary judgment [in favor of Plaintiffs] is inappropriate." Bernal, 579 F.Supp.2d at 808.   Plaintiffs satisfy this initial burden because Defendants cannot demonstrate that they informed the Plaintiffs (any Plaintiffs – regardless of where employed) that "at the very least" notice was given by the Defendants to the Plaintiffs of their intention to treat tips as satisfying part of the Defendants' minimum wage obligations.   Tango Rest., 969 F.2d at 1322.   Defendants thus fail to satisfy the first element of the tip credit test.   See Section IV. A., supra.   Not only did Devito fail to identify how the Defendants informed the Plaintiffs that Defendants were applying Plaintiffs' tips against the Defendants minimum wage requirements, but Devito even admitted that she was unsure whether the Defendants were claiming a tip credit from 2007 through 2010.[15]  (Exh. 1; pg. 67).   Devito testified that Defendants claimed a tip credit based on the actual subminimum wages paid, the fact the Plaintiffs reported their tips, and on their earning statements.  (Exh. 1; pg. 98-99). This is insufficient as a matter of law.   On the other hand, Plaintiffs have produced affirmative evidence that the Defendants did not inform their employees of the provisions of Section 203(m), as nowhere in the employee handbook pre-suit or in any of the training manuals produced by Defendants are there any reference to any provision of Section 203(m) (or for that matter, provisions of the MWHL).[16]  (Exhs. 3-10).  In Austin Ramba, the District Court entered Summary

---

[15]     Similarly, Devito could not testify that the Defendants informed their tipped employees working in Maryland that the tip credit taken may not exceed 50 percent of the minimum wage established under Maryland law, see LE art. § 3-419(a).  (Exh. 1; pg. 91).

[16]     Plaintiffs reasonably anticipate that Defendants will object to the introduction of the evidence regarding changes made by Defendants in their notification to managers, trainers, and employees after the lawsuit was filed, pursuant to Fed.R.Evid. 407.  Such objections, however, would not be well-founded because Plaintiffs proffer such evidence for purposes permitted under Rule 407, including (a) to refute Defendants' defense as to how they informed employees after a certain date, such as Ashton Nicolas, Kristin Murphy and others who worked up until and even after May 2010; (b) to demonstrate central control over HR matters; (c) to establish the existence of a common policy; (d) to show the feasibility of the measures taken by Defendants; (e) to rebut claims of "habit" evidence; and (f) to challenge the credibility of the two affiant managers submitted by Defendants to support their alternative Motions.  Defendants have submitted the manager affidavits in part to undermine Devito's Rule 30(b)(6) deposition testimony that there

Judgment on a collective action tip credit claim, finding it "noteworthy" the absence of any information pertaining to the provisions of Section 203(m) in the employee handbooks.  Austin Ramba, 722 F.Supp.2d at 725-26; cf. Holder v. MJDE Venture, LLC, 2009 WL 4641757, *2 (N.D. Ga. 2009) ("The Defendants also say they provided proper notice because they had a written policy [b]ut do not point to any evidence that they gave a copy of this policy to the Plaintiff.").

Additionally and alternatively, summary judgment may also be entered because the Defendants fail to satisfy the second requirement of Section 203(m), i.e., that they inform employees that they have a right to retain their tips except for a valid tip pool.  While Devito denied that tipped employees were forced to pay for customer walk-outs, (Exh. 1; pg. 124), she testified that employees were only "informed" of their right to retain tips in the sense that they got to walk out with their tips.  (Exh. 1; pgs. 86-87).

But the policy of the Defendants was to compel their tipped employees to pay for customer walk-outs.  A former manager, Morris Bell, averred as much in his affidavit.  (Exh. 14).  At least three of the Plaintiffs, Solorzano, Wainwright, and Charnigo, were forced to pay for customer walk-outs.  (Exh. 13; 68-69, 79-84; Exh. 30, ¶ 9; Exh. 23 and ¶ 9, respectively).

Summary judgment is appropriate, because the unrebutted evidence establishes that

---

was centralized control over labor relation matters and that limitations were placed on managers and trainers about the information they gave to hirees and employees regarding, inter alia, tips, tip credits, and the minimum wages under the law.  With regard to their Motion for Decertification, discussed infra, Defendants contend that the Plaintiffs are not similarly situated.  To the contrary, Plaintiffs have presented compelling and overwhelming evidence, including the post-litigation changes in policy taken by Devito company-wide, to show that all Plaintiffs were subject to the same policy regarding tips and tip credits and were clearly similarly situated.  Further, Plaintiffs submit that the measures taken by the Defendants post-litigation all could have been feasibly taken from the outset of Defendants' operations.  Plaintiffs are uncertain whether Defendants contest that fact.  If contested, the feasibility evidence clearly would be admissible.  Defendants could put the feasibility issue to rest by admitting that the actions taken by HR after the litigation feasibly could have been taken previously.  Finally, the credibility of Cammarata and Lilly (and any other managers Defendants present) is seriously at odds with the deposition testimony of Devito, Defendants' Rule 30(b)(6) witness.  The post-litigation measures taken by Defendants show that compliance with the notification requirements was not on Defendants' radar screen until at least February 2010, contrary to the averments made by Cammarata and Lilly.

Defendants deducted losses from customer walk-outs.  "To the extent Plaintiffs were not permitted to retain their tips to pay for shortages and unpaid tabs, Defendants disqualified themselves from taking advantage of the FLSA tip credit provisions."  Bernal, 579 F.Supp.2d at 810.  Summary judgment therefore should be granted to Plaintiffs, because Defendants cannot establish that they allow Plaintiffs to retain their tips.

The Defendants never informed the Plaintiffs of the provisions of Section 3(m) of the FLSA.  And why would they?  Informing the Plaintiffs that they could retain all of their tips, an important provision of Section 203(m), would have conflicted with the Defendants desire to maximize corporate profits and management bonuses, by forcing tipped employees, such as the Plaintiffs, to repay the Greene Turtle by shouldering the obligation for repaying customer walk-outs. It is shameful that the Defendants would shift their business risks onto workers receiving wages less than the minimum wage.  To paraphrase from the Fourth Circuit's decision in Richard, for Defendants to have informed their employees "would have invited trouble," because not only would employees have realized that they have a right to their tips, but they would have realized that they were receiving half of the 1996 minimum wage rate – a startling proposition for any worker. Cf. Richard, 549 F.2d at 305 (as "[a]n employer cannot reasonably expect employees to happily accept being told that they will not get (one-half) the minimum wage ordered by Congress.").[17]

V.      Plaintiffs' Opposition to Decertification

Recognizing full well the weakness and implausibility of their arguments, the Defendants now move in the alternative for decertification.  Of course, there is inherent tension between

---

[17]      It is certainly plausible to imagine that if tipped employees generally, and these Plaintiffs in particular, understood that they were receiving half of the minimum wage last set in 1996 – with no corresponding increases to the minimum wage over the years, see Doc. 137-2, pg. 16 n.5 (setting forth increases in minimum wages), the workers could have refused to pay for customer walk-outs, collectively engaging in action to protect their rights. See 29 U.S.C. § 151 et seq.

Defendants' contention that Summary Judgment should be granted to them based on the arguments discussed above, while out of the other corner of their mouth, arguing that Plaintiffs' claims are too dissimilar for class adjudication. In any event, the Defendants' arguments in favor of decertification are without merit.

### A. Standards for Decertification

The only case in the District of Maryland to grant a decertification motion is <u>Gionfriddo et al. v. Zink, et al.</u>, 769 F.Supp.2d 880 (D. Md. 2011) (Bennett, J.). Judge Bennett first observed that the second "more stringent" phase occurs after the completion of discovery.[18] <u>Gionfriddo</u>, 769 F.Supp.2d at 886 ("following discovery, the court engages in a more stringent inquiry... .") (<u>quoting</u> <u>Rawls v. Augustine Home Health Care, Inc.</u>, 244 F.R.D. 298, 300 (D. Md. 2007) (Nickerson, J.) (denying decertification)).

While Plaintiffs bear the burden of showing their claims are "similarly situated," courts have ruled that " 'similarly situated' need not mean 'identical.' " <u>Gionfriddo</u>, 769 F.Supp.2d at 886. The two Courts in this District addressing whether Plaintiffs have satisfied their burden, have used three factors: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." <u>Id.</u> (citing <u>Rawls</u>, <u>supra</u>).

In <u>Rawls</u>, <u>supra</u>, Judge Nickerson denied a defense request to decertify in a collective action case brought by certified nursing assistants (CNAs) all of whom sought unpaid overtime, and in doing so, rejected an argument that individualized defenses and "substantial differences" among four different geographic locations warranted decertification. <u>Rawls</u>, 244 F.R.D. at 300-02. The employer argued that "significant differences" existed among the living units where the CNAs

---

[18]     Even Defendants recognize that decertification comes "following the completion of merits discovery... ." (Doc. 137-2, pg. 22).

worked, but Judge Nickerson ruled that "Plaintiffs share a common issue as to whether the facilities they worked constitute 'private homes' for purpose of the [FLSA] companionship exemption." Id. at 302.  In determining whether it could " 'coherently manage the class in a manner that will not prejudice any party,' " the Court ruled that the collective actions would be subdivided into four separate sub-classes representing each facility where CNAs worked.  Id.  (quoting Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000).

In Gionfriddo, Judge Bennett granted a Motion for Decertification as to two Plaintiffs in the case.  The factual and legal theories of those two Plaintiffs are totally inappropriate here.  In Gionfriddo, Judge Bennett noted first that the "central issue" was whether or not the tip pooling arrangement was "illegal under the FLSA and Maryland state analog statutes." He observed that an Opt-In Plaintiff, "Emar," a bartender like three of the Plaintiffs who sought to recover the minimum wage like those Plaintiffs, was maintaining claims that were based on completely different factual and legal theories.  Gionfriddo, 769 F.Supp.2d at 887.  In ruling that Emar's claims would involve "substantial individualized determinations," Judge Bennett reasoned that the three bartender Plaintiffs "are clearly similarly situated as their claims all rest on the same facts and common questions of law."  Id.  Emar's was decertified and dismissed without prejudice, with claims tolled as of the date he filed his opt-in consent form.  Id. at 888.  But "[i]n starker contrast" to the "tip pool claims" was Plaintiff Garrison, who worked as a Sous Chef and who sought overtime wages.  Id. Garrison never received tips as a Sous Chef and was never part of the tip pool.  Id.  As a result, Garrison – who was a party named in the Complaint, was severed with her claims to proceed in a separate action.  See id. at 884.

B.  Facts In Support of Plaintiffs' Opposition to Decertification.

The limited discovery that the Court allowed was focused on whether and how the

Defendants complied with the provisions of Section 203(m).  As set forth below, it is inappropriate for the Court to entertain this Motion, at this time, particularly given the posture of this case.

Nevertheless, the Plaintiffs have gathered various facts which completely rebut the Defendants' premature Motion for Decertification.  For example, Devito is the Executive Vice President of the Greene Turtle Franchising Corp., which owns and operates the Greene Turtle sports bar/nightclubs at issue in this case.  (Exh. 1; pgs. 8-10).  Approximately 75 percent of her entire work day is spent handling HR matters across the various Greene Turtle restaurants, as she readily admits that she is the point of contact for getting information to the managers of the company-owned stores, i.e., she provides "any employee-related items that they might need advice on or counsel."  (Exh. 1; pgs. 11-12).  All of the company-owned sport bars/nightclubs operate under the same employee handbook, and managers and CTs are trained according to the same materials.  (Exh. 1; pgs. 18-19 & Exhs. 3-10).  The same documents are provided to employees regardless of what sports bar/nightclub they work, except employees might receive different tax forms, depending upon the employee's state of residence.  (Exh. 1; pgs. 18-21).  Employment applications are likewise the same.  (Exh. 1; pg. 19).  Employees receive the same training materials.  (Exh. 1; pgs. 23, 30).  Employees are administered the same tests.  (Exh. 1; pg. 24).  Employees are all given bi-weekly paychecks, and there can be no dispute that all of the Plaintiffs in this case received less than the actual minimum wage required under 29 U.S.C. § 206(a).  The same checklist is used by managers, system-wide, with new hires.  (Exh. 1; pg. 83).  All managers receive the same training materials, which Devito alleges includes "how to hire someone, what you go through, payroll… ." (Exh. 1; pgs. 31-32 & Exh. 9).  The same person, Jennifer DeMent, handles all manager and CT training.  (Exh. 1; pg. 89).  Devito suggests to each location what is to be posted.  (Exh. 1; pg. 38).  Devito and her colleague in the corporate office, Mike Pollard, are

responsible for wage/hour compliance for company-owned sports bars/nightclubs, and they were responsible for finally ordering the DOL FLSA posters after this lawsuit was filed.  (Exh. 1; pgs. 43, 45, 119).  Every pay period, they *allegedly* claim to check every single tipped employee's pay, across the entire system, to determine whether tips received at least equaled the full minimum wage owed.  (Exh. 1; pg. 104).  Prior to 2010, Devito turned to the same lawyer, Steven Cain, Esq., for employment law advice.  (Exh. 1; pgs. 47-48).  Devito agrees with Michael Sanford, the CEO, that the Defendants have a standard hiring procedure for tipped employees.  (Exh. 1; pg. 111).

Importantly, Devito claims that what managers say (or more precisely, not say) at the time of hiring is "policy," which "comes from this office," and while there may be differences in expression and speech, what is generally communicated in terms of information should not differ from one manager to another.  (Exh. 1; pgs. 53-54).  Devito admits that it does not differ, because the managers are given one direction and one training process from corporate.  (Exh. 1; pg.  54).  Devito testified (falsely, as revealed by the actual training materials), that managers are trained to say that once a tipped employee completes training, they will be making "three dollars and something cents per hour."[19]  (Exh. 1; pg. 59).  Devito admits that across the sports bars/nightclubs operated by Defendants, the only thing said to employees with respect to their tips is that they must be reported.  (Exh. 1; pg. 67).  Devito defends her employment practices, claiming that not only is wage information "directed from corporate to be communicated," but employees see it on their paycheck.  (Exh. 1; pg. 82).  Devito claims that all employees of the Greene Turtle are informed of their intent to take a tip credit, "via the wage poster and the handbook."  (Exh. 1; pg. 91).

---

[19]    Two former managers have testified that they never received any training from the Greene Turtle about the minimum wage, the tip credit, or the legal requirements regarding the payment of wages for tipped employees, and that no in Greene Turtle management (or the training program for managers) instructed them to tell new employees or applications what they would be paid, how they would be paid, or anything about the tip credit.  (Exh. 33 Scarborough ¶1-2; Exh. 14; Bell ¶¶ 1-8).

The only apparent difference, *at this time based on this limited discovery*, is that each store has its own tip pooling policy.  (Exh. 1; pg. 86).  For example, BWI tipped employees had to give tips to "grab and go girls," (Exh. 15; pg. 55-56), and at least one Towson Plaintiff stated that she paid tips over to a manager.  (Exh. 17; pgs. 53-55).

### C. Plaintiffs' Counter-Arguments In Opposition To Defendants' Arguments, And In Favor of Maintenance Of This Case As A Section 216(b) Action.

#### i. Discovery Is Not Complete So Consideration of Decertification Must Wait.

The simplest reason why Defendants' Motion for Decertification should be denied is that it is premature.  Courts address decertification motions at the close of discovery.  Gionfriddo, supra. After a limited period of discovery (limited in issues and the type of discovery allowed), it is premature to address the decertification issue.

#### ii. The Record Reveals That Corporate "Policy" Comes From Devito In The Corporate Office, And The Policy Is The Lack of FLSA Compliance.

Defendants' argue, falsely, that the "record demonstrates that the tip credit notification practice at issue was implemented in an *ad hoc*, decentralized manner depending upon the individualized circumstances at each Restaurant," citing back to the affidavits of Cammarata and Lilly.  (Doc. 137-2, pg. 28).

This is patently frivolous and worthy of Rule 11 sanction.  If the "record" demonstrates anything, it is that Devito single-handedly controlled HR functions throughout all Greene Turtle sports bars/nightclubs.   Everything, from handbooks, applications, training materials, training contents, was centrally controlled and repeated from location to location without fail. (Exh. 1; pgs. 53-54) (stating that what is communicated by managers is "policy" and "comes from this office"). Before submitting this frivolity, Defendants had at least the candor to admit through the affidavit of their CEO, Michael Sanford, that they have a "standard hiring procedure."  (Doc. 34; ¶ 18 & Exh. 1;

pg. 111 (Devito agreeing with ¶ 18 of Sanford's affidavit).  In contrast to the inadmissible and immaterial affidavits of Cammarata and Lilly, Devito bound the Defendants when she admitted that the only thing managers say regarding tips, is that "[y]ou earn tips, you report tips."  (Exh. 1; pgs. 67-68).  This passing reference, allegedly said by all managers to hirees, hardly informs employees that the Defendants will apply their tips against the Defendants' minimum wage obligations.  29 U.S.C. § 203(m).  Plaintiffs in this case challenge a Company-wide policy of non-compliance with Section 203(m), and their claims are subject to generalized proof.  Given centralized control of HR and standardized policies and practices, no doubt exists that the Plaintiffs are similarly situated.  Courts have rejected similar decertification motions.  See, e.g., Alonso v. Uncle Jack's Steakhouse, Inc., 2011 WL 4389636, * 3 (S.D.N.Y. Sept. 21, 2011) (rejecting defense decertification argument in FLSA case, that tipped employees were not similarly situated due to differences in job titles, store locations, managers and schedules).

### iii. Plaintiffs' Past Employment, Employment Applications, Or Awareness Of The Tip Credit Provisions, No Matter How Divergent From Plaintiff to Plaintiff, Present No Available Defense to Defendants, And Therefore, Cannot Be Relied Upon To Obtain Decertification.

Defendants next spend quite a bit of their argument capital addressing "each Plaintiff's various experiences – or lack thereof – working under other employers' tip credit arrangements and how those arrangements compared to" the Greene Turtle sports bars/nightclubs where they worked.  (Doc. 137-2, pgs. 28-31). But as quickly demonstrated, "[i]f arguments had feelings, this one would be embarrassed to be here." Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287 (11th Cir. 2007).

As stated, *one* of the *three* factors used in deciding whether to decertify a conditionally certified Section 216(b) collective action, is the "various defenses *available* to the defendant which appear to be individual to each plaintiff." Gionfriddo, supra at 886 (italics added) (quoting Rawls,

244 F.R.D. at 300 (citation omitted).  It logically follows that only an "available" (thus, legally viable) defense can be used to challenge a conditional certification.

Defendants first raise the defense that "some" Plaintiffs "expected to be paid under the tip credit arrangement."  (Doc. 137-2, pgs. 28-29 (citing employment applications).  Defendants then claim some but not all Plaintiffs "expected to be paid" under the tip credit provisions of Section 203(m).  (Doc. 137-2, pg. 29).  What is written in an employment application is irrelevant, because what matters is whether the *employer* informed an employee of the provisions of Section 203(m).[20] See Martin v. Tango Rest., Inc., 969 F.2d 1319, 1323 (1st Cir. 1992) ("The waiters' willingness to work for wages of $2.95, where $3.35 might be earned in other available jobs, might be some proof that the waiters expected to earn and retain their tips, but it does not suggest even mildly that the waiters knew anything of the minimum wage laws or defendants' intention to claim a tip credit against their obligations."); see also Austin Ramba, supra, 722 F.Supp.2d at 725 ("employment applications are not probative evidence that Defendant even, at a minimum, *informed* Plaintiffs of its intent to implement the tip credit provisions of Section 203(m).") (italics in original);  Dominguez v. Don Pedro Restaurant, 2007 WL 2884370, * 2-3 (N.D. Ind. Sept. 26, 2007) (denying restaurant employer's motion to compel past work experience in a tip credit case, reasoning that "[r]egardless of Dominguez's past employment, the FLSA demands that the defendants inform him of the tip credit's application to his subsequent employment.   Consequently, Dominguez's previous knowledge of the tip credit provision is irrelevant to the defense," also ruling that previous

---

[20]      If what was written as the "salary desired" in an employment application served as a defense, then Defendants would have attempted to use that as grounds for Summary Judgments – but revealingly they did not.

employment history is not relevant to a defense for liquidated damages).

Defendants' argument that some of the Plaintiffs worked for subminimum wages at other restaurants, while others did not, is similarly unavailing.  (Doc. 137-2, pgs. 29-30).  Defendants cite Plaintiff Solorzano's response that it is "industry standard" to pay servers a subminimum wage because they receive tips, see id., but Courts find this same argument "unpersuasive," because if Courts were "to permit Defendants to substitute their statutory responsibility for an alleged general awareness of an industry-wide practice, the notice prerequisite of Section 203(m) would be satisfied in every instance, and Section 203(m) would be rendered mere surplusage."  Bernal, supra, 579 F.Supp.2d at 809.

Therefore, Defendants do not have and have not raised "available" or "viable" individualized defenses to the Plaintiffs' claims, by arguing as they have, that because some Plaintiffs requested a "tip credit pay arrangement"[21] in their employment applications,  or had "divergent experiences" previously "working under tip credit arrangements," that their commonality is unglued.  (Doc. 137-2, pg. 31).

### iv.  Defendants' Argument That This Case Is Unmanageable As A Collective Action Lacks Candor and Common Sense.

Defendants next argue that this case has "[s]erious case management issues," rendering it unmanageable as a collective action, because the Plaintiffs are "building a Trojan Horse."  (Doc. 137-2, pg. 32).  What Defendants are speaking of is the deposition testimony of the Plaintiffs, who were asked about all of the complaints they had regarding their employment and wages, and then a semi-legal question like "are you asserting those claims in this case?"  Relying on these answers, the Defendants are the only ones building an empty argument, or like Don Quixote, jousting at windmills.

---

[21]      Of course, as a matter of fact, no Plaintiff actually used those words.

This case does not involve off-the-clock hours.  The claims that are "asserted" in this case are those contained in the Fourth Amended Complaint (Doc. 116), which contains nothing about "off-the-clock" hours, with the exception of Count IV, which applies to the Delaware Plaintiffs.[22]  This is yet another example of "gotcha" questioning by defense counsel: quiz Plaintiffs on legal claims.  When asked *again*, and at the very end of her deposition, whether Solorzano was "asserting" claims arising over her termination based on her refusal to pay the Greene Turtle for a customer walk-out (which in no way was her fault), Solorzano wisely asked defense counsel what he meant by his use of the word "asserting," and using his definition, she expressed that she was not bringing a claim based on her termination, as part of this case.  (Exh. 13; pg. 85).  Defendants do not get to re-write the Plaintiffs' Collective Action Complaint, by asking "gotcha"-type questions in a deposition, to build their Trojan Horse argument for decertification.[23]  Likewise, Plaintiffs' counsel is under no professional obligation to press allegations of relatively small off-the-clock hour claims against the Defendants.  Defendants should focus on the claims written in the Fourth Amended Complaint (Doc. 116), rather than falsely accusing Plaintiffs' of building a "Trojan Horse."[24]

---

[22]  Further investigation has revealed that it appears to be the policy of the Greene Turtle to force new hires to "volunteer" their time and energy and work for free to open a new restaurant (i.e., before a restaurant even opens its doors for the first time).  Apparently, the same occurrence regarding workers in Delaware who had to agree to work for free, as a condition of employment, happened when the Greene Turtle opened its location in Fredericksburg, Virginia.

[23]  Defendants cite an instance in which Plaintiffs' counsel (Warbasse) stated that "working without pay" is "relevant to the tip credit."  (Doc. 137-2, pg. 32).  If section 203(m) requires that an employee receive at least $2.13/hour, there is certainly a strong argument to be made that when some hours in a workweek go unreported and uncompensated, the hourly rate is not $2.13/hour but something less.  But, at least one court has rejected a claim that being forced to work "off-schedule" hours results in the unavailability of a tip credit for the employer.  Dominguez v. Quigley's Irish Pub, Inc., 790 F.Supp.2d 803, 819-20 (N.D. Ill. 2011).  While arguments might be made to the contrary of Dominguez, what is clear is that Plaintiffs' counsel sought to avoid limiting the Defendants' deposition of the Plaintiff, which was the right way to handle the situation.  At the time, Warbasse was also without the benefit of research on this issue.  Statements by counsel in a deposition do not substitute for what is contained in the four corner of a Complaint.  If Plaintiffs amend their Complaint to add these "off-the-clock" training and studying hours, then Defendants' argument could be properly presented to the Court.

[24]  Because the Court should reject the Defendants' false premise (i.e., that Plaintiffs are building a Trojan Horse), it also should reject the conclusion (i.e., decertification is warranted).

Defendants' arguments for decertification also lack common sense.   Defendants likely hope that decertification will result in 60+ claims, which if undersigned counsel were to pursue, would require the payment of a filing fee ($350.00) multiplied 60 times, dramatically and unfairly increasing counsel's financial and time commitments to the Plaintiffs.   But the Plaintiffs are *named* Plaintiffs, and like the Plaintiff Garrison in <u>Gionfriddo</u>, <u>supra</u>, would only be severed into sixty different cases for this Court to hear.   Hoping to wear out the resources of the Plaintiffs, the Defendants give not a care in the world as to what even 30 cases would mean for this Court, assuming, perhaps correctly, that not every Plaintiff would pursue an individual action. <u>See</u> <u>Rawls</u>, 244 F.R.D. at 302 (weighing the third factor, the "fairness and procedural considerations factor," Courts consider the "primary" objective of Section 216(b) collective actions to be, "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity.").

Plaintiffs submit that Defendants have not thought through the implications or the effect their decertification motion might have, to all parties and the Court, if it were granted.   Defendants clearly have not thought about the consequences of severance on the alternative overtime claim in this case.   Do they really want this entire case to devolve into multiple proceedings where relatively small amounts might be at stake?

What is clear is that the circumstances in this case resemble <u>Rawls</u> where decertification was denied, not <u>Gionfriddo</u>, where decertification was warranted.   All of the Plaintiffs assert a common claim: they were not informed of the provisions of Section 203(m).   Plaintiffs anticipate Trial in this matter using substantial number of Plaintiffs to testify, and organizing them per State, and then per the location where they worked.   <u>Cf.</u> <u>Rawls</u>, <u>supra</u>.   The Court could even bifurcate liability issues and damage issues per-location.   There will be no confusion over the additional

claims of the Delaware Plaintiffs, or the Maryland Plaintiffs who have claims arising under both the FLSA and MWHL.  Assuming arguendo that Defendants have raised a triable issue with respect to providing the Plaintiffs with information concerning the provisions of Section 203(m), they will be able to present their defenses to the representative testimony by cross examining the testifying Plaintiffs, and presenting their own evidence at Trial, which could include calling as hostile witness Plaintiffs who are not named to testify in Plaintiffs' case-in-chief as representatives.  See Falcon et al. v. Starbucks Corp., 580 F.Supp.2d 528, 540 (S.D. Tex. 2008) (denying decertification, and observing that Defendants may examine representative plaintiffs and present their own evidence at trial); Wilks et al. v. The Pep Boys, 2006 WL 2821700, *7 (M.D. Tenn. Sept. 26, 2006) (denying decertification, noting that in a collective forum, defendants will be able to present evidence of their lawful policies and practices, cross-examine individual representative plaintiffs, and call to the stand others with material testimony that helps the defendants' case); Takacs v. Hahn Automotive Corp., 1999 WL 33127976, *3 n.4 (S.D. Ohio Jan. 25, 1999) ("To the extent that the Defendant's objection to the manner in which the Plaintiffs propose to prove their damages arises out of a desire to cross-examine some or all of those who will not testify, the Defendant is certainly entitled to attempt to do so, by issuing subpoenas upon them.  At an appropriate time, the Court would determine, in accordance with Rule 403, whether the probative value of the cross-examination is outweighed by its cumulative nature.").

In sum, the "available" defenses to the Defendants in this case, whatever those defenses may be (again, the ones identified by Defendants are "*unavailable*"), would not, on this record,

render this case unmanageable.[25]   In close cases, the remedial nature of the FLSA at least suggests that whether FLSA Plaintiffs are similarly situated should be resolved in favor of certification.  Falcon, supra at 541.  But this is not even a close case.

## IV.   Conclusion

If the Defendants had informed their tipped employees that they would have had their tips applied against the Defendants' minimum wage obligations, and that their tipped employees, at least under the FLSA, would receive only half of the 1996 minimum wage rate, there is no telling whether the Plaintiffs simply would have accepted the information and taken employment with the Greene Turtle, rejected the job offer, or asked probing questions to learn how the Greene Turtle intended to fulfill its minimum wage obligations, but at least the Defendants would have complied with one of the two provisions of Section 203(m).  And, if the Defendants had informed the Plaintiffs that they had a right to retain all of their tips except in a *valid* tip pooling arrangement, the Defendants' employees might have rejected Defendants' job offer, or might have protested over the requirement to pay for customer walk outs or turn their tips over to "grab and go girls," but at least Defendants would have complied with the other requirement of Section 203(m).

But it is undisputed that Defendants in this case did neither.  They utterly failed to inform Plaintiffs of the Greene Turtle's minimum wage obligations under Section 203(m).  If the Court is concerned with the penalty facing these Defendants, it merely should recall that "[i]f the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." Martin v. Tango Rest., Inc., 969 F.2d at 1323.

---

[25]   Defendants appear to have the same defense to every Plaintiff.  (This is not to say Plaintiffs consider this a *viable* defense).  Assuming arguendo individual factual determinations must be made, which on this record does not appear to be the case, such a "need for individual determinations is not fatal to certification of a FLSA collective action."   Underwood v. NMC Mortg. Corp., 2009 WL 1322588, *3-4 (D. Kan. May 11, 2009) (denying decertification argument based on the disparate factual and employment settings of the individual plaintiffs).

The Plaintiffs request a ruling denying Defendants' Motion for Summary Judgment and Defendants' alternative Motion for Decertification, and request a ruling granting Summary Judgment in Plaintiffs' favor.

Respectfully submitted,

| | |
|---|---|
| _____/s/_____ | _____/s/\_(with permission) |
| Howard B. Hoffman, Esq. | Bradford W. Warbasse, Esq. |
| Federal Bar No. 25965 | Federal Bar No. 07304 |
| 600 Jefferson Plaza, Suite 304 | 401 Washington Avenue, Ste. 200 |
| Rockville, Maryland 20852 | Towson, Maryland 21204 |
| (301) 251-3752 | (410) 337-5411 |
| | |
| *Counsel for Plaintiffs* | *Counsel for Plaintiffs* |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of January, 2012, a copy of the foregoing Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment/Decertification and Cross Motion for Summary Judgment, along with all Exhibits and other attachments, was filed via the Electronic Case Filing System (ECF) maintained by the U.S. District Court for the District of Maryland, and is available for viewing and downloading from the ECF system.

_____/s/_____
Howard B. Hoffman
