**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                              |     |                      |
|------------------------------|-----|----------------------|
|                              | :   |                      |
|                              | :   |                      |
| CRAIG DORSEY, ET AL.         | :   |                      |
|                              | :   |                      |
|                              | :   |                      |
| v.                           | :   | Civil No. CCB-10-92  |
|                              | :   |                      |
|                              | :   |                      |
| TGT CONSULTING, LLC, ET AL.  | :   |                      |
|                              | :   |                      |
|                              | :   |                      |

## <u>MEMORANDUM</u>

Several motions are now pending in this collective action brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219. Lead plaintiff Craig Dorsey, a former server at the Greene Turtle bar and restaurant at BWI airport, brought this suit for minimum wage and overtime violations on behalf of himself and those similarly situated against The Greene Turtle Franchise Corporation, various related companies, and two executives of those companies. After limited discovery on the issue of the FLSA "tip credit" provision, 29 U.S.C. § 203(m), defendants have filed a motion for summary judgment or in the alternative for decertification of the collective action. Dorsey has filed a cross-motion for summary judgment, as well as a motion for sanctions and a motion in limine protesting evidence provided as part of defendants' summary judgment motion. The parties have each filed a motion to seal portions of their respective briefs and evidence. Dorsey has also filed a motion to strike affirmative defenses pled by the individual defendants and a motion to amend the scheduling order. The motions have been briefed and no hearing is necessary. *See* Local Rule 105.6. For the following reasons, plaintiffs' motion to seal and motion to strike affirmative defenses will be granted, and all of the other pending motions will be denied.

1

# I.   BACKGROUND

The Greene Turtle is a restaurant and bar franchise concept with establishments in Maryland, Delaware, Virginia and the District of Columbia.  Defendant Greene Turtle Franchising Corporation ("GTFC") owns a controlling share in some of the establishments, though not in all of them. Defendant Michael Sanford is the CEO of GFTC.  Defendant Teri DeVito is the company's Executive Vice-President, and she oversees human resources for the corporate-owned Greene Turtle locations.  Defendant TGT Consulting, LLC ("TGT") is owned by GTFC and provides payroll services to the Greene Turtle restaurants.

On January 14, 2010, Dorsey brought suit against defendants, alleging various violations of the FLSA, including violations of the statute's minimum wage and overtime provisions.  Dorsey amended his complaint several times to add additional plaintiffs and claims.  On September 14, 2010, the court conditionally certified the case as an FLSA collective action and approved plaintiffs' request to mail class members a notice of their opportunity to opt into the case.  *Dorsey v. The Greene Turtle Franchising Corp.*, No. 10-92, 2010 WL 3655544 (D. Md. Sept. 14, 2010). Approximately sixty current and former employees filed opt-in consent forms, and all of them have been joined as named plaintiffs in the Fourth Amended Complaint.  (ECF No. 116.)

On June 21, 2011, the parties agreed to a schedule directed at first addressing plaintiffs' claim that defendants did not properly apply the FLSA tip credit provision in 29 U.S.C. § 203(m). The plan limited discovery to three Greene Turtle locations, at Towson, Verizon Center, and BWI. The plaintiffs would be allowed to depose a corporate representative for defendants and no more than one manager from each of the three locations, and defendants would be allowed to depose no

more than two plaintiffs for each of the three locations.  The parties would also be allowed to take limited written discovery on the tip credit issue.  (Letter to Counsel, June 30, 2011, ECF No. 114.)

During the discovery period that followed, the plaintiffs served document requests on defendants and obtained copies of employee handbooks and training materials.  Plaintiffs also served interrogatories and noticed a Rule 30(b)(6) deposition of defendants, for which defendant DeVito was deposed.  Plaintiffs did not depose any location managers.  Defendants deposed and served document requests on five of the plaintiffs, Ashton Nicolas, Kristin Murphy, Anna Stair, Tanesha Neal, and Renata Solorzano.

After discovery had been completed, defendants filed the instant motion for summary judgment, or in the alternative for decertification.  Defendants' motion included and referenced portions of the depositions taken and the affidavits of two location managers who had not been deposed, Mark Cammarata and Jared Lilly.  Defendants also attached copies of the payroll records of plaintiff Nicolas and copies of the employment applications of plaintiffs Solorzano and Neal.  Plaintiffs filed a response and cross-motion for summary judgment, referencing the discovery and also the affidavits of other plaintiffs who had not been deposed.

## A.  Standardized human resources procedures

The record indicates that the Greene Turtle locations overseen by DeVito followed standardized hiring and management procedures.  Defendants summarized the process in the motion for summary judgment:

> After filling out an employment application, applicants for server or bartender positions are interviewed by a manager at the restaurant where they applied. Upon their hire, each server must complete a training program to learn the menu, how to operate the "MICROS" food and beverage ordering and payment system, how to record work hours, and how to properly serve customers. In addition to classroom

3

training, each server must "shadow" an experienced server for several shifts.

(Def.'s Mot. Summ. J. 7, ECF No. 137-2.)

It also appears from the record that tipped employees were uniformly paid using the tip credit provision of the FLSA, which allows businesses to pay less than the minimum wage to employees who receive tips, as long as certain requirements are met. *See* 29 U.S.C. § 203(m) (2006). As discussed in more depth below, an employer may utilize the tip credit provision of the FLSA only where employees are informed by the employer of the relevant provisions of the FLSA and where the employees are allowed to retain all tips received, except for approved tip pooling policies. (*Id.*) The parties disagree as to whether Greene Turtle met these requirements.

### B. Evidence that defendants informed employees of the tip credit

According to DeVito's deposition testimony, Greene Turtle managers are trained to tell employees that "they will be receiving a sub minimum wage because they will be reporting their tips." (DeVito Dep. 61, ECF No. 141-2.)[1] This alleged policy does not appear to be documented in writing. Newly-hired Greene Turtle managers receive a large training binder, with between three hundred and four hundred pages of material, including material related to human resources. (*Id.* at 32.) Managers also receive a checklist to fill out for each new hire. But defendants do not make any claim that either the manager's binder or the checklist contains any reference to a policy of informing new hires about how their wages be calculated.

---

[1] In their briefing, defendants summarize the policy as one in which the "Restaurants' practice is to inform tipped employees that their compensation is subject to the tip credit, but they do not provide this information to each employee in the same manner, by the same personnel, at the same time." (Def.'s Mot. Summ. J. 7, ECF No. 137-2.) DeVito's testimony, however, does not support the claim that during the relevant time period the restaurant managers were instructed to or did inform employees in any way other than, allegedly, through managers or general managers during the interview process.

While there is no documentary evidence of the alleged policy, both Cammarata and Lilly testified in their affidavits that they advised new hires of the tip credit practice.  For Cammarata, who worked as the general manager at the BWI location between April 2007 and November 2009 and as a district manager over the BWI and Towson locations from November 2009 to June 2010, this communication allegedly took place during the interview process:

> During the interview process, we discussed how the applicant would be trained and paid if hired. In particular, we explained to the applicant that he or she would be required to undergo training, described the training, and explained how he or she would be assigned work. In addition, we discussed how he or she would be paid. Applicants applying for a tipped position were told that during the training period, they would be paid a training wage that was equal to the full minimum wage, but no tips. We explained, however, that once training was completed, their hourly wage would be reduced and that they would earn tips. In other words, applicants were told that their base wage rate would be reduced below the minimum wage after the training period and that they would make up the balance of their income through tips that they earned.

(Cammarata Aff. ¶ 6, ECF No. 137-11.)  For Lilly, who worked as an assistant manager at the Verizon Center location from July 2009 until September 2010, the discussion allegedly took place subsequent to the interview:

> On the first day of the hiring/training process, I would discuss with the new hire tax forms and rate of pay that the new hire would receive. For individuals hired into tipped positions, I would explain that during their training period, they would be paid a minimum wage equal to the full minimum wage, without tips. I also explained that when their training was complete, their wage would be reduced to the regular server wage (which I believe was $2.38 per hour during my tenure) and that the balance of their income would be from tips. The overwhelming majority of individuals with whom I spoke, in the neighborhood of 95%, were already aware that they would receive a wage lower than the minimum wage rate, which would be supplemented by tips, as a result of prior experience working in other restaurants.

(Lilly Aff. ¶ 7, ECF No. 137-12.)[2] Plaintiffs, however, reference affidavits of Morris Bell, who was employed as an assistant manager at both the Verizon Center and the BWI location, and Jeremy Scarborough, who was employed as an assistant manager at the Verizon Center from the Fall of 2008 to February 2009. Bell testified that he had interviewed hundreds of job applicants, including plaintiffs Sophie Gage and Richard Wainwright, and that "[n]o one in Greene Turtle management ever instructed me to tell new employees or applicants what they would be paid, how they would be paid, or anything about the tip credit during the hiring process (or after they were hired)." (Bell. Aff. ¶ 2, ECF No. 141-15.) Bell further noted when hiring Gage and Wainwright specifically, he "never told [them] anything about the minimum wage, how they would be paid or what their hourly wage would be." (*Id.* at ¶ 3.) Scarborough testified that no one had ever instructed him to tell new applicants how they would be paid, but rather that his job was to "review the applicants' work experience and to determine whether they would be a 'good fit.'" (Scarborough Aff. ¶ 2, ECF No. 141-34.)

The plaintiffs uniformly testified that they were not informed of the tip credit or pay structure by managers prior to beginning work. Only one of the plaintiff deponents, Kristin Murphy, testified that she had been interviewed by either Cammarata or Lilly, in her case Cammarata. Murphy testified, however, that neither Cammarata nor anyone else informed her of the wage structure or the fact that tips would be counted toward the minimum wage. (Murphy Aff. ¶¶ 1–2, ECF No. 141-17.) One plaintiff, Nicolas, did testify that she was advised during her training period that she would be paid less after she began making tips. (Nicolas Dep. 98, ECF No. 137-4.) She was not advised of

---

[2] As discussed below, the plaintiffs have filed a motion contesting the inclusion of these two affidavits as evidence in this case as violations of Fed. R. Civ. P. 30(b)(6), which governs the procedure for deposing representatives of corporations. They additionally argue that the affidavits should be ignored on relevance grounds.

this by a manager, however.  Rather, the pay structure came up in conversation with a co-worker, Katie Mason, whom she was shadowing.  According to Nicolas, Mason did not use the term "minimum wage" or tell her what amount exactly she would be making after training.  Nicolas recounted the conversation during her deposition:

> At the time I was told to shadow her, but she was not told by management to go through everything with me.  It came up as a casual conversation just in terms of well, you make a decent amount, do you, do you not, what would you say.  It wasn't in terms of by the way, you should know this is what you make per hour, this is why you're paid this much.  That conversation never took place.

(*Id.* at 123.)  In an affidavit, Mason denied having discussed the minimum wage with Nicolas, (Mason Aff. ¶3, ECF No. 141-32), and Nicolas stated that when she herself later became a trainer she was "given no instruction" as to whether or how to advise trainees about the minimum wage. (Nicolas Dep. 160.)  Rather, "it was preferred that we not get into that because then it would kind of bring up the issue of them getting tips or not getting tips during their training period." (*Id.* at 161.)

Other evidence in the record confirms that it was not standard procedure for co-worker trainers to inform trainees of the pay structure.  A training handbook, "Train the Trainer 101," does not contain any reference to wages or pay structure. (ECF No. 142-1.)  And, DeVito stated that trainers are "[n]ot generally" involved in discussing wages with new employees "because that's something that's discussed before hire with a potential new employee and the manager and ultimately the general manager interviewing that person." (DeVito Dep. 54.)

As a final note, the record contains no evidence that employees were expressly notified of the tip credit through any written materials prior to the initiation of this lawsuit.  DeVito testified that the corporate-owned Greene Turtle locations now notify employees of the tip credit through Department of Labor ("DOL") FLSA posters and in an employee handbook. (*Id.* at 91.)  However,

7

Greene Turtle first purchased FLSA posters in February 2010, (*id.* at 40), and DeVito could not confirm that posters were posted in any of the Greene Turtle locations prior to that date. (*Id.* at 44.) Similarly, the current employee handbook went into effect after the initiation of the lawsuit, (*id.* at 17; Employee Handbook Revised May 2010, ECF No. 141-9), and none of the previous versions of the handbook mentioned the wage structure, the FLSA, or the provisions of Section 203(m). (*See* ECF No. 141, Exs. 4–7.)[3] And finally, new hires are given a twenty-page binder of training materials, but defendants make no claim that those materials contain reference to the tip credit.

During the depositions, however, defendants' counsel questioned each plaintiff about the biweekly earnings statements that showed their wage rates differing depending on whether or not they had reported tips during that period. The earnings statements included in the record show a reduced rate of pay during pay periods in which employees reported significant tips and an increased rate of pay during pay periods when no tips were reported. (*See* Earning Statements, ECF No. 137-13.) In similar colloquies with each deposed plaintiff, defendants' counsel repeatedly asked plaintiffs whether they could think up any explanation for the differing wages shown on the earnings statements other than the tip credit. In each case, after multiple objections by plaintiffs' counsel, the plaintiffs admitted that they did not have any other explanation.

In one exhausting and illustrative line of questioning cited by defendants in their briefs, plaintiff Nicolas was asked four times over the objection of plaintiffs' counsel if there was "any other explanation," other than the tip credit, for the way in which the earnings statements showed her base wage fluctuate. Defense counsel finally reframed the question and asked a fifth time:

---

[3] The prior versions of the employee handbook mention that "all tips must be reported at the end of your shift," but do not discuss the hourly wage or the relationship between tips and the minimum wage. (*See, e.g.*, Employee Handbook Revised January 2009 at 7, ECF No. 141-8.)

Q:  . . . I understand what you're saying.  I'm not asking what you understood at the time.  Okay?  I'm saying right now sitting here today you recognize that you were provided with documents that show that in weeks you received tips you were paid a subminimum wage and in weeks that you weren't paid tips you received the full minimum wage and that the only explanation for that now, looking back, based on your conversation with Katie [Mason], is that you were being paid pursuant to the tip credit. . . .  Isn't that correct?

A: [Objection]  My understanding today is that yes, that the explanation for this is that there was a tip credit in place; however, I did not know what the tip credit was.  I had no understanding of a tip credit.  I was never informed of a tip credit.  You would have to understand a tip credit to know that's what would explain the rate of pay. . . .

Q: I hear what you're saying.  And this understanding that you have now comes from these documents, correct?

A: [Objection]  No.

Q: The information in these documents reveals that tip credit, correct?

A: [Objection]  The reason why I understand these documents is because I have been made aware through this suit what a tip credit is.

Q:  And the documents now confirm what you understand about the tip credit, correct?

A: [Objection] The documents would prove a tip credit was taken.

Q: Thank you.

(Nicolas Dep. 127–29, ECF No. 141-12.)

When defense counsel asked similar questions of plaintiff Solorzano, her answers suggested that she knew that the tip credit was a standard practice in the restaurant industry:

Q: . . . . Do you have an explanation as to why [your wage rate depended on whether you received tips], other than the use of the tip credit by The Greene Turtle?

9

A: [Objection]  Industry standard.

(Solorzano Dep. 61, ECF No. 141-14.)  Solorzano appears to have been familiar with the industry standard prior to working at The Greene Turtle as well, as on her employment application she listed her "desired salary" as "at least $2.08 + tips."  (ECF No. 137-14.)


### C.  Allegations that employees were required to pay for customer walk-outs

Several plaintiffs testified that Greene Turtle managers require employees to cover the costs of customer bills out of their tips when a customer leaves without paying.  In her deposition, plaintiff Solorzano testified that she was terminated from her employment after refusing to pay for a customer walk-out.  (Solorzano Dep. 68.)  Other plaintiffs who were not deposed during discovery testified in their affidavits that they had been required to pay for a walk-out from their tips.  (*See* Richard Wainwright Aff. ¶ 6, ECF No. 141-31; Kathleen Charnigo Aff. ¶ 9, ECF No. 141-24.)  And Bell, the assistant manager, testified in his affidavit that it was "the practice of the Greene Turtle to require tipped employees to pay a customer's bill if the customer walked out without paying."  (Bell Aff. ¶ 9.)  Bell added that he "overheard Rick Clagett, the General Manager, explain that voided checks due to customer walk outs affected the profit and loss statement, which the corporate office held against management bonuses."  (*Id.*)  DeVito denies that any such policy existed, however, (DeVito Dep. 124), and plaintiffs do not contend that there is any evidence of such a policy in the training materials or employee handbook.  On the other hand, plaintiffs argue, there is no evidence in any materials or any of the depositions that plaintiffs were informed by management that they had the right to retain all of their tips.

**D.  Additional motions pending**

Plaintiffs filed three other motions at the same time as their cross-motion for summary judgment.  The first is a motion to exclude the affidavits of Cammarata and Lilly because, plaintiffs allege, the content of the affidavits should have been provided through the Rule 30(b)(6) deposition of defendant DeVito.  (ECF No. 138.)  Second, plaintiffs moved to exclude portions of the deposition testimony in which defense counsel repeatedly asked the plaintiff employees if they could identify any explanation other than the tip credit for the content of their earnings statements.  (ECF No. 139.)  And, finally, plaintiffs moved to file under seal the training materials included as exhibits to the opposition and cross-motion for summary judgment.  (ECF No. 140.)  Defendants filed responses in opposition to the motions to exclude, but did not oppose the motion to seal.

Also pending are three motions unrelated to the cross-motions for summary judgment.  The first is defendants' motion to seal the briefing of the now-moot motion for a protective order.  (ECF No. 126.)  The second is plaintiffs' motion to strike affirmative defenses pleaded by the individual defendants in their answer to the Fourth Amended Complaint.  (ECF No. 140.)  And the final motion is a motion filed by plaintiffs requesting the court revise the current scheduling order.  (ECF No. 155.)

## II.  <u>DISCUSSION</u>

**A.  Summary judgment standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c)(2).  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

"When both parties file motions for summary judgment, the court applies the same standards of review." *Loginter S.A. Y Parque Indus. Agua Profunda S.A. Ute v. M/V NOBILITY*, 177 F. Supp. 2d 411, 414 (D. Md. 2001) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).  "The role of the court is to 'rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* (quoting *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172

(D. Md. 1985)).

### B. FLSA Tip Credit Provision

The FLSA requires covered employers to pay "nonexempt employees" a minimum wage for each hour worked, 29 U.S.C. § 206(a), but allows employers to pay less than the minimum wage to employees who receive tips, 29 U.S.C. § 203(m).  "Tipped employees . . . are required to receive at least the minimum wage, but their employers are permitted to pay a direct wage of $2.13 per hour and then take a 'tip credit' to meet the $7.25 per hour minimum wage requirement."[4] *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 893 (D. Md. 2011) (citing 29 U.S.C. § 203(m)).  "In other words, an employer satisfies the FLSA if he pays his tipped employees at least $2.13 per hour, and that wage, in conjunction with the tips they receive, make up at least the $7.25 per hour minimum wage." *Id.*

Section 203(m) contains two further requirements, however, both of which are at issue in this case.  The tip credit

> shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subSection, and all tips received by such employee have been retained by the employee, except that this subSection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

29 U.S.C. § 203(m).  Thus, "to utilize the tip credit, during the relevant time frame the employer was required to (1) inform the employee that the tip credit was being claimed; and (2) allow the employee to retain all tips he or she received. . . . " *Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d

---

[4] The language of the 1996 amendment to the FLSA fixed the minimum cash wage at one half of the federal minimum wage at the time, *see* Public Law 104-188, § 2105(b) (1996), which was $4.25 an hour, *see* Public Law 101-157, § 5 (1989).

164, 175 (D.D.C. 2011).[5]

These two additional requirements in section 203(m) are "strictly construed," and "must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Copantitla v. Fiskardo Estiatorio, Inc.,* 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011) (quoting *Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002)).

> What the Congress has said, in effect, to restaurant employers is that, if you precisely follow the language of 3(m) and fully inform your employees of it, you may obtain a 50 percent credit from the receipt of tips toward your obligation to pay the minimum wage. The corollary seems obvious and unavoidable: if the employer does not follow the command of the statute, he gets no credit.

*Richard v. Marriott Corp.*, 549 F.2d 303, 305 (4th Cir. 1977).

"Although an employer need not 'explain' the tip credit to an employee, Courts have widely interpreted section 203(m) to require at a minimum that an employer inform its employees of its intention to treat tips as satisfying part of the employer's minimum wage obligations." *Bernal v. Vankar Enters., Inc.*, 579 F. Supp. 2d 804, 809 (W.D. Tex. 2008) (listing cases). Thus, it is not sufficient that employees "be aware of the tip credit provisions." *Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 724 (W.D. Tex. 2010). "Rather, section 203(m) affirmatively requires employers to inform employees of the provisions contained in section 203(m)." *Id.*

Similarly, "Congress, in crafting the tip credit provision of section 3(m) of the FLSA did not create a middle ground allowing an employer both to take the tip credit and share employees' tips." *Gionfriddo*, 769 F. Supp. 2d at 893 (quoting *Chung*, 246 F. Supp. 2d at 230). "[A]n employer is not eligible to take the tip credit, and will be liable for reimbursing an employee the full minimum wage

---

[5] "The employer bears the burden of demonstrating that it is entitled to claim the FLSA's 'tip credit.'" *Johnson v. VCG Holding Corp.*, --- F. Supp. 2d ----, 2012 WL 769487, at *16 (D. Me. Mar. 9, 2012) (citing *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 882 (8th Cir. 2011)).

that employee would have earned, if the employer exercises control over a portion of the employee's tips." *Id.* at 894 (quoting *Davis v. B & S, Inc.*, 38 F. Supp. 2d 707, 714 (N.D. Ind. 1998)).  As a result, "[t]o the extent Plaintiffs were not permitted to retain their tips to pay for shortages and unpaid tabs, Defendants disqualif[y] themselves from taking advantage of the FLSA tip credit provisions." *Bernal*, 579 F. Supp. 2d at 810.

### C.  New tip credit notice regulation

Although the notice requirements of section 203(m) were enacted in 1974, the Department of Labor did not promulgate a final regulation implementing the statutory requirement until May 5, 2011.  The new rule, codified at 29 C.F.R. § 531.59(b), includes a more detailed notice requirement than courts had previously mandated.  In relevant part, the new regulation states that "an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance . . . that all tips received by the tipped employee must be retained by the employee . . . ." 29 C.F.R. § 531.59(b).  Thus, under the new regulation, it is not sufficient that employers "allow the employee to retain all tips he or she received." *Arencibia*, 831 F. Supp. 2d at 175.  Rather, employers must also *inform* employees of the requirement that they must be allowed to retain all of the tips.  As discussed below, the parties disagree as to whether this regulation applies retroactively in this case.

### D.  Defendants' motion for summary judgment

The core of defendants' summary judgment claim is that the biweekly earning statements functioned to inform plaintiffs of the tip credit.  (Def.'s Mot. Summ. J. 19.)  In support of this argument, defendants offer the deposition testimony of the plaintiff employees, each of whom was

asked repeatedly if anything other than the tip credit could explain their earnings statements.  For

example, defendants argue that plaintiff Nicolas's deposition statement that the earnings statements

"would prove a tip credit was taken," (Nicolas Dep. 129), supports the conclusion that the earnings

statements were sufficient to inform her as required by section 203(m).[6]

Defendants cite no relevant case law for the proposition that earnings statements such as the

ones in this case are sufficient to "inform" employees as required.  At least one other district court

has expressly held that similar earnings statements are *not* sufficient.  *See Bernal*, 579 F. Supp. 2d at

810 (granting summary judgment for plaintiffs because, in part, "[t]he Court cannot say that any

reasonable juror would find that Defendants disclosed their intention on the face of the pay stubs or

reprinted checks").  Defendants argue that the earnings statements in this case are distinguishable

from those in *Bernal*, because some earning statements here show a higher wage when no tips were

reported, thus allowing employees to compare statements and draw the appropriate conclusion.  The

court is unconvinced.  Neither category of Greene Turtle earnings statements contained reference to

the federal minimum wage.  As a result, even considered together, the earnings statements could not

*alone* have informed employees that their tipped wage was subminimum and that a certain

percentage of their tips were being applied to meet federal minimum wage requirements.  *See Reich*

*v. Chez Robert, Inc.*, 821 F. Supp. 967, 977 (D. N.J. 1993) (noting an employer does not meet its

obligation to "inform" under section 3(m) when it tells its tipped employees that they will be paid a

specific wage but does not explain that that wage is below the minimum wage and that it is

---

[6] Plaintiffs vigorously contest the use of this deposition testimony.  In a separate motion in limine, plaintiffs argue that the aggressive and repeated questioning that led to Nicolas's statement and others like it used "gotcha" tactics, asked plaintiffs to provide expert or legal opinions, and resulted in statements that were not relevant to the question of whether defendants had *informed* their employees of the provisions of section 203(m).  (ECF No. 139.)  The court agrees that there is little, if any, relevance value to the testimony.  As discussed below, however, the testimony does not affect the outcome of the motions for summary judgment and decertification.  Accordingly, plaintiffs' motion in limine will be

permitted by law based on the employees' tips), *rev'd on other grounds*, 28 F.3d 401 (3d Cir. 1994)).

The plaintiffs' deposition testimony only confirms that the pay stubs were not adequate notice of the provisions of section 203(m).  The use of Nicolas's statement about the earnings statements as proof of the tip credit, for example, is taken wholly out of context.  Defense counsel had expressly told Nicolas that he was "not asking what [she] understood at the time" but rather what she thought about the pay stubs "sitting here today."  (Nicolas Dep. 127.)  And when Nicolas stated that she now understood the tip credit to be the explanation for the differing wage rates on her pay stubs, she expressly stated that her understanding had come from the lawsuit and not from the documents themselves.  (*Id.* at 129.)  In its proper context, this testimony says little or nothing about how employees interpreted, or reasonably should have interpreted, the earnings statements at the time they were received.[7]

With no evidence of any written notification, defendants' motion for summary judgment turns on whether the Greene Turtle orally informed its employees of the wage structure.  The evidence in the record demonstrates a genuine dispute.  On the one hand, DeVito testified that the Greene Turtle trained its managers to inform new hires of the wage structure.  On the other, *all* of the deposed plaintiffs denied that managers did in fact notify them.  In addition, former assistant managers Bell and Scarborough testified in their affidavits that they had not been trained to properly inform new hires.  (Bell. Aff. ¶¶ 2–3; Scarborough Aff. ¶ 3.)[8]  Viewed in the light most favorable to

---

denied, though without prejudice to future consideration as to the use of the deposition testimony at trial.

[7] Moreover, even if the court were to agree with defendants that the pay stubs properly informed employees of the tip credit, a genuine dispute of material fact exists as to whether the Greene Turtle managers followed a practice of docking employees' tips to cover customer walk-outs.  Businesses are "disqualified" from taking a tip credit where they "deduct[] losses due to cash register shortages and unpaid tabs" from employees' paychecks or nightly tips.  *Bernal*, 579 F. Supp. 2d at 810.

[8] Defendants argue that the court should strike any reference to the affidavits of employees who defendants did not have an opportunity to depose.  (ECF No. 161, at 5.)  The court, however, does not rely on the affidavits in denying summary

the plaintiffs, plaintiffs' deposition testimony is sufficient to create a genuine dispute as to whether oral notification took place.[9]   As a result, defendants' summary judgment motion must be denied.


### E.   Plaintiffs' motion for summary judgment

Plaintiffs argue that the court must grant summary judgment in their favor because there is no evidence in the record that defendants informed their employees of the right to retain all of their tips, as required under the newly-enacted DOL regulations.   Although the alleged violations in this case all occurred prior to the enactment of the new rule, plaintiffs argue that the rule should be applied retroactively because it is a "clarifying" regulation.   *See Whiting v. John Hopkins Hosp.*, 680 F. Supp. 2d 750, 754 (D. Md. 2010) (applying an FMLA regulation retroactively because it "merely clarifies existing law").   Defendants disagree.   The new regulation was recently upheld against a challenge under the Administrative Procedure Act, *see Nat'l Rest. Ass'n v. Solis,* --- F. Supp. 2d ----, 2012 WL 1921115 (D.D.C. May 29, 2012), but the question of whether the rule applies retroactively appears to be one of first impression.   *See Arencibia*, 831 F. Supp. 2d at 180 n.6 (declining to address whether plaintiffs could rely on a DOL fact sheet based on the new rule for a claim brought prior to its enactment).

After reviewing the parties' arguments and the rulemaking history of 29 C.F.R. § 531.59(b), the court concludes that the new rule does not apply retroactively.   "The law disfavors retroactivity,"

---

judgment; plaintiffs' depositions alone provide sufficient dispute of material fact as whether proper notification took place.   The court similarly does not rely on the affidavits in denying plaintiffs' cross-motion for summary judgment and defendants' motion for decertification.   Thus, without deciding whether the plaintiffs' attachment of the affidavits was proper, the court denies defendants' request as moot.

[9] Nicolas's conversation with Mason during her training period does not undermine this conclusion.   It is true that "notice can also be conveyed to employees through an individual co-worker regardless of whether that individual meets the technical definition of 'employer' under the FLSA."   *Davis v. B & S, Inc.*, 38 F. Supp. 2d 707, 719 (N.D. Ind. 1998).   As mentioned above, however, defendants do not allege—and there is no evidence of—any policy or general practice of

*Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 176 (4th Cir. 2010) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)), in part because retroactivity inevitably raises concerns about "unfairness." *Id.* As a result, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language *requires* this result." *Bowen*, 488 U.S. at 208 (emphasis added). "In general, courts will apply a statute retroactively only if 'that result is so clearly compelled as to leave no room for reasonable doubt.'" *Ward*, 595 F.3d at 174 (quoting *Hyder v. Jones*, 245 S.E.2d 123, 125 (S.C. 1978)). Though a regulation may apply retroactively if it "merely clarifies existing law," *Whiting*, 680 F. Supp. 2d at 754 (citing *Brown v. Thompson*, F.3d 253, 259 (4th Cir. 2004)),[10] this does not appear to be the case with the new tip credit notification rule.

"In determining whether a revision of a rule changes or merely clarifies existing law, the Court 'looks to statements of intent made by [the enacting body].'" *Id.* at 754 (quoting *Brown*, 374 F.3d at 259 (alterations in the original)). In *Whiting*, for example, the court found that the DOL had intended the FMLA rule at issue to apply retroactively because the preamble of the new regulation had stated that the new version "proposed to clarify" a contested issue, and "in the interest of clarity" the DOL proposed to "make explicit" what the department had "always intended." *Id.* (citing 73 Fed. Reg. 67987). In addition, the *Whiting* court noted, the DOL regulation at issue "sought only to rectify 'the perceived ambiguity' that had led to conflict among the circuits." *Id.* The Fourth Circuit has noted that "a conflict in the courts as to the proper interpretation of a statute" may be "an indication that Congress passed a subsequent amendment to clarify rather than change exiting law."

---

using co-worker trainers to inform new hires of the section 203(m). Under such circumstances, the Greene Turtle cannot take credit for the fact that a co-worker trainer may have fortuitously done so on one occasion.

[10] "A rule simply clarifying an unsettled or confusing area of the law . . . does not change the law, but restates what the law according to the agency is and always has been." *Whiting v. John Hopkins Hosp.*, 680 F. Supp. 2d 750, 754 n.4 (D.

*Brown*, 374 F.3d at 259 n.2 (citations omitted).

The new DOL tip credit notification regulations, unlike the FMLA regulations at issue in *Whiting*, contain no language suggesting that the Department intended them to be retroactive. There is no language specifically stating that the notification provisions are meant to clarify ambiguity, at least with regard to the notification of the right to retain tips. Plaintiffs have not argued that there is any noticeable conflict in the courts as to this issue.[11] And the DOL's final rule appears to acknowledge that the new regulation represents a change in the law, at least at it has been applied by the courts. *See* 76 FR 18844 ("To the extent that . . . courts have reached different results, the Department notes that those courts generally failed to consider the important legislative developments underlying the FLSA's tip credit provisions and we choose to not be guided by those decisions in this revision of the regulations.").[12] This court therefore cannot hold that the language of the rulemaking "requires the result" of retroactive effect. *Bowen*, 488 U.S. at 208.[13]

Having concluded that 29 C.F.R. § 531.59(b) does not apply retroactively, the court turns to plaintiffs' alternative argument in support of their cross-motion for summary judgment—that there is no "admissible" evidence supporting the inference that the Greene Turtle orally informed its employees of the tip credit wage structure. Defendants argue that the combination of DeVito's

---

Md. 2010) (quoting *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993)).

[11] While the DOL final rule does note that "courts have disagreed over the level of notice required to 'inform' a tipped employee about section 3(m)," 76 FR 18843, the agency does not appear to refer to the question at issue here, but rather the extent to which the employer must "inform" of as opposed to "explain" the manner in which tip credit works.

[12] Given the awkward wording of the statute and the weight of prior authority, this court is not prepared to conclude, as did the court in *Nat. Restaurant Ass'n*, that the new regulation is "probably compelled by" the statute. *Nat'l Rest. Ass'n*, 2012 WL 1921115 at *11. The court does agree, however, that DOL's interpretation is permissible and that "DOL was under no obligation to adopt [prior court holdings] if, in its reasonable judgment, it determined that a different approach was more appropriate." *Id.* at *13.

[13] Plaintiffs also argue that defendants should have been on notice as to the possible rule change as early as July 28, 2008, when the notice of proposed rulemaking was filed for the new regulation. The NPRM, however, did not include the new language at issue here, *see* 73 FR 43654, 43668, and the court therefore fails so see how the NPRM could have provided the alleged notice.

deposition testimony and the affidavits of the two managers, Cammarata and Lilly, are sufficient to create a genuine dispute as to whether the employees were properly informed. Plaintiffs counter that the two affidavits were improperly submitted, and that in any event they do not provide relevant facts because they do not specifically claim to have informed the specific plaintiffs who were deposed.

Here, the court must agree again with defendants. Plaintiffs argue that DeVito and the Greene Turtle abused the discovery process by failing to do enough to prepare for her Rule 30(b)(6) deposition and then ambushing plaintiffs with the manager affidavits. Rule 30(b)(6) provides that persons designated to represent an organization "shall testify as to matters known or reasonably available to the organization." *Intern'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda,* 390 F. Supp. 2d 479, 487 (D. Md. 2005). Thus, the rule "requires a good faith effort . . . to find out the relevant facts – to collect information, review documents, and interview employees with personal knowledge." *Wilson v. Lakner, M.D,* 228 F.R.D. 524, 528–29 (D. Md. 2005). As a corollary, depending on the "nature and extent of the obfuscation, the testimony given by [a] non-responsive deponent (e.g., 'I don't know') may be deemed 'binding on the corporation' so as to prohibit it from offering contrary evidence at trial." *Wilson,* 228 F.R.D. at 530 (citing *Rainey v. Am. Forest & Paper Assoc.*, 26 F. Supp. 2d 82, 94–95 (D.D.C. 1998)).

Admittedly, DeVito could have done a better job of preparing for her deposition. She could have interviewed Cammarata and Lilly ahead of time and then testified with authority that Greene Turtle managers had in fact appropriately informed employees; instead she testified only as to what managers were trained or instructed to do and disclaimed any certainty as to what they actually did. Under the circumstances, however, her testimony does not rise to the level of obfuscation or suggest

21

some effort by the Greene Turtle to ambush the plaintiffs or abuse the discovery process. As defendants point out, it was plaintiffs who requested an expedited and limited discovery process in the first place. Plaintiffs could have deposed Cammarata and Lilly as part of this process, but chose not to. Accordingly, the court will deny plaintiffs' motion for sanctions under Rule 30(b)(6), and will consider the two affidavits in this motion for summary judgment.

Considering the two affidavits in combination with DeVito's testimony, the court finds sufficient evidence to create a genuine dispute as to whether the Greene Turtle managers did in fact properly inform plaintiffs during the hiring process. As plaintiffs rightly point out, neither affidavit contains an unequivocal statement that the respective manager actually informed any specific plaintiff of the tip credit provisions. Plaintiffs argue that given the timing and location of his employment, it is not possible that Lilly interviewed any of the plaintiffs. And plaintiffs note that Cammarata stated with certainty only that he was involved in the process to hire Dorsey. With regard to the content of any notification, he stated only, "I believe that I discussed the method of payment with Mr. Dorsey when he was hired because I tried very hard to be consistent from individual to individual in terms of the explanations that I gave to them." (Cammarata Aff. ¶ 9.)

Nonetheless, when viewed in the light most favorable to defendants, the affidavits and DeVito's testimony provide sufficient evidence of the alleged policy and practice of the Greene Turtle of informing new hires of the interplay between their tips and the minimum wage. At this time, after limited discovery, the court therefore cannot conclude that summary judgment for the plaintiffs would be appropriate. Plaintiffs' cross-motion will be denied.

### F.  Motion for decertification

Under the FLSA, a collective action for unpaid minimum or overtime wages may be

22

maintained "by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated*." 29 U.S.C. § 216(b) (2006) (emphasis added). "In deciding whether to certify a collective action under the FLSA, courts generally follow a two-stage process." *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010). The first stage, called the "notice stage," generally occurs before much, if any, discovery has taken place. At this time, the court makes a threshold determination of "whether the plaintiffs have demonstrated that potential class members are 'similarly situated,' such that court-facilitated notice to the putative class members would be appropriate." *Id.* (quoting *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000)). The court granted conditional certification in this case on September 14, 2010. *See Dorsey*, 2010 WL 3655544.

At the second step, following the conclusion of discovery, "the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] 'similarly situated' in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action." *Syrja*, 756 F. Supp. 2d at 686 (quoting *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007)). Generally, "plaintiffs bear the burden of showing that their claims are 'similarly situated,'" and "district courts have broad discretion to determine whether a collective action is an appropriate means for prosecuting an FLSA cause of action." *Gionfriddo*, 769 F. Supp. 2d at 886 (citation omitted). "In considering a motion to decertify alleging dissimilarity of the plaintiff class, courts have considered three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Rawls*, 244 F.R.D at 300.

23

### 1.      Existence of a uniform policy

"The first factor of the decertification analysis involves an assessment of whether Plaintiffs have provided evidence of a company-wide policy which may violate the FLSA, as well as an assessment of Plaintiffs' job duties, geographic location, supervision, and salary." *Id.* Defendants argue that there is no uniform policy that would allow an FLSA collective action because the record "demonstrates that the tip credit notification practice at issue was implemented in an ad hoc, decentralized manner depending upon the individualized circumstances at each Restaurant." (Def.'s Mot. Summ. J. 28; *see also* Def.'s Reply Mot. Summ. J. 14, ECF No. 161.) In support of this argument defendants cite *Wal-Mart Stores, Inc. v. Dukes*, in which the Supreme Court denied Rule 23 class certification where " [t]he only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters." 131 S. Ct. 2541, 2554 (2011).

As an initial matter, many courts have found caselaw addressing Rule 23 class certifications to be inapposite in FLSA cases.[14] Even if *Dukes* does apply here, however, the record does not at this time reflect defendants' characterization of an "ad hoc, decentralized" system. Rather, defendant Sanford testified that the corporate-owned Greene Turtle restaurants had a "standard hiring procedure," (Sanford Aff. ¶ 18, ECF No. 141-35), and this procedure was overseen by

---

[14] *See, e.g., Essame v. SSC Laurel Operating Co.*, --- F. Supp. 2d ----, 2012 WL 762895 at * 6 (D. Md. Mar. 12, 2012) ("Because of the special policy considerations that the FLSA comprehends, Rule 23 standards are generally inapplicable to FLSA collective actions."); *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009) (noting that Congress could have, but did not, import "the more stringent criteria for class certification under Fed. R. Civ. P. 23" into the FLSA); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996) (holding that FLSA collective action requirements "are independent of, and unrelated to, the requirements for class action under Rule 23"); *LaChapelle v. Owens Illinois, Inc.*, 513 F.2d 286, 289 (5th Cir. 1975) (holding that Rule 23(c) "opt-out" and § 216(b) "opt-in" actions are "mutually exclusive and irreconcilable").

defendant DeVito and her office.  The corporate office distributed uniform application materials, employee handbooks, management training materials, and train-the-trainer materials to each corporate-owned location.  Managers are trained by DeVito's office and "the policy comes from" her office.  (DeVito Dep. 53.)  DeVito testified that managers are trained to say the same things and in the same way, "they're given one direction, one training process from corporate."  (*Id.* at 54.)

The only fact defendants provide in support of their argument is Nicolas's deposition testimony that she had discussed wage and tip policy with her co-worker trainer.  (Def.'s Reply Mot. Summ. J. 14.)  But, as discussed above, the evidence in the record contradicts the contention that the conversation between Nicolas and Mason was held at the instruction of management.  Rather, the only corporate policy in the record as to co-worker training appears to be a policy of *discouraging* any discussion of wages during the co-worker training period.  (DeVito Dep. 54; Nicolas Dep. 161.)  It thus does not appear from the initial record that the conversation between Mason and Nicolas should be considered to be notification by "the employer," as required by the statute.  As a result, the conversation does not support the argument that individual locations or managers were allowed to, or did, devise their own methods of discussing wage policy.

There is no evidence in the record, therefore, to support the contention that the Greene Turtle maintained "a policy against having uniform employment practices."  *Dukes*, 131 S. Ct. at 2554. Rather, the evidence in the record at this time is that defendants did maintain a standardized company policy for how to hire and train new employees, and DeVito and the managers report consistent instructions to managers and a consistent practice of properly informing employees. Plaintiffs, on the other hand, similarly allege that a policy existed, but allege that the policy did not include the required notification.  Every plaintiff's deposition supports this allegation.

25

As a result, the other cases defendants cite are similarly distinguishable, as they involve written corporate policies that *complied* with the FLSA—from which local managers had allegedly deviated. *See Thompson v. Speedway SuperAmerica LLC*, 2009 WL 130069, at *9 (D. Minn. Jan. 20, 2009) (finding claims "inappropriate for certification" where there did not appear to be a corporate decision to ignore the employer's published policies, which otherwise complied with the FLSA); *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, *7 (E.D. La. July 2, 2004) (determining certification was improper where claim was for improper deviations from defendant's official policy). In those cases, the courts found no overarching illegal policy that connected the locations, thus requiring a location-by-location investigation of management practices. Here, to the contrary, there is no written policy, and the plaintiffs allege that the overall corporate policy *itself* violated the FLSA by prescribing a standardized hiring process that did not contain proper notification.

### 2.     Individualized defenses

Defendants' core argument as to this second factor is that they would advance individualized defenses based on "each Plaintiff's various experiences – or lack thereof – working under other employers' tip credit arrangements and how those arrangements compared to" the Greene Turtle's system. (Def.'s Mot. Summ. J. 28–31). As an example, defendants offer the evidence in Solorzano's deposition testimony and her employment application that demonstrates she had been paid in a similar manner at prior establishments and had knowledge of an industry standard.

As the court noted above, however, it is not sufficient that employees "be aware of the tip credit provisions." *Pedigo*, 722 F. Supp. 2d at 724. "Rather, section 203(m) affirmatively requires employers to inform employees of the provisions contained in section 203(m)." *Id.* If courts were

"to permit Defendants to substitute their statutory responsibility for an alleged general awareness of an industry-wide practice, the notice prerequisite of Section 203(m) would be satisfied in every instance, and Section 203(m) would be rendered mere surplusage." *Bernal*, 579 F. Supp. 2d at 809. Defendants have provided no argument to show how employees' prior awareness of an industry standard would affect the question of whether Greene Turtle management informed them of the wage structure. Plaintiffs' differing levels of awareness of the industry standard does not, therefore suggest the existence of individualized defenses as to each plaintiff. *See Martin v. Tango Rest., Inc.*, 969 F.2d 1319, 1323 (1st Cir. 1992) ("The waiters' willingness to work for wages of $2.95, where $3.35 might be earned in other available jobs, might be some proof that the waiters expected to earn and retain their tips, but it does not suggest even mildly that the waiters knew anything of the minimum wage laws or defendants' intention to claim a tip credit against their obligations.").

### 3.    Fairness and procedural considerations

"Finally, under the fairness and procedural considerations factor, the Court considers the primary objectives of allowance of a collective action under § 216(b), namely '(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity.'" *Rawls*, 244 F.R.D. at 302 (quoting *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000)). "The Court also must 'determine whether it can coherently manage the class in a manner that will not prejudice any party.'" *Id.* (quoting *Moss*, 201 F.R.D. at 410). Defendants here rest their argument on the latter question of manageability.

Defendants' arguments about manageability, however, are premature, as they do not address the issue at hand—the tip credit notification.  Rather, defendants argue that the notification is a "Trojan Horse" for other claims that will be raised later.  (Def.'s Mot. Summ. J. 32.)  Specifically, defendants note statements some employees made during their depositions suggesting that they had not been paid at all for various "off-the-clock" activities, (*id*.), and express the concern that measuring these off-the-clock activities would require individualized inquiries.  The manageability of those potential claims, however, which were not part of the limited discovery order, does not affect the manageability of the notification claim.

The only manageability argument defendant advances as to the notification claim is that it would require individualized inquiry to determine the number of hours each plaintiff worked.  Given that the hours are centrally recorded and available on pay stubs, however, no complex inquiry would be necessary; calculation of the hours would require only the exercise of elementary math.

There are, however, procedural and fairness reasons to proceed with notification claims as a collective action.  The potential damages in this case are relatively low, and therefore "each individual Plaintiff would be unlikely to pursue his or her claim because of the costs involved relative to the damages sought."  *Rawls*, 244 F.R.D. at 302.  And the plaintiffs' claims depend on a common question of whether there was, in fact, a company-wide policy requiring managers to advise plaintiffs of the tip credit.  Considering these arguments, as well as all of the above three factors, the court concludes that decertification of the tip credit notice claim is not appropriate at this time.

**G.  Motions to Seal**

Two motions to seal are now pending.  First, defendants filed a motion on September 12, 2011, moving to file under seal their opposition to plaintiffs' motion for protective order.  (ECF No. 126.)  This first motion to seal was contested by plaintiffs.  Second, plaintiffs filed an uncontested motion to provisionally file under seal two of the exhibits in their opposition and cross-motion for summary judgment.  (ECF No. 140.)

Local Rule 105.11 requires that a party seeking to seal documents offer reasons supported by specific factual representations justifying the sealing and an explanation for "why alternatives to sealing would not provide sufficient protection."  Local Rule 105.11 (D. Md. 2011); *see Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 120–21 (D. Md. 2009).  In evaluating a motion to seal, the court must weigh the right of public access, which "derives from two independent sources: the common law and the First Amendment."  *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004).  "A district court must then weigh the appropriate competing interests under the following procedure: it must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing."  *Id.* at 576.

Defendants' initial motion to seal will be denied.  Defendants filed this motion in order to discuss income and tax reporting activities of the individual plaintiffs "without revealing or disclosing to the public this information concerning plaintiffs, at least until plaintiffs have had the opportunity to decide whether this information should be sealed."  (Def.'s Mot. Seal ¶ 2, ECF No. 126.)  Defendants stated that they "will defer to plaintiffs' counsel and the court as to whether defendants' opposition should remain sealed."  (*Id.* at ¶ 3.)  Plaintiffs' counsel subsequently opposed

29

the motion to seal, suggesting that defendants in fact had moved to file the opposition brief under seal in order to protect defendants' own interests. (ECF No. 132, at 1.) As a result, it appears that defendants' motion to seal is moot.

Plaintiffs filed the second motion on January 16, 2012, to provisionally file under seal Greene Turtle's train-the-trainer and the manager training documents, both of which were obtained through discovery. Plaintiff states that the documents are not "per se sensitive," but filed the motion to seal the opposing parties' documents "out of an abundance of caution and in the interest of maintaining civility between the parties." (ECF No. 140, at 1–2.) Defendants have not opposed the motion to seal.

Having reviewed the documents, the court agrees that they may contain confidential and proprietary information and therefore merit sealing in this case. Both the common law presumption of access and the First Amendment right of public access attach to documents filed in conjunction with a dispositive motion such as a motion for summary judgment in a civil case. *Va. Dep't of State Police*, 386 F.3d at 576; *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252 (4th Cir.1988). Here, the court finds that the materials at issue merit protection even under the more stringent First Amendment right. The documents represent a "compilation of information" that give Greene Turtle "an opportunity to obtain an advantage over competitors" and therefore may be considered to be trade secrets that provide the requisite compelling government interest. *See Minter*, 258 F.R.D. at 122 (quoting 3 Jack B. Weinstein, *Weinstein's Federal Evidence* § 508.04 (2d ed. 2009)).

The court also has considered and followed the other procedural and substantive requirements necessary before granting a request to seal. The public has had over six months to object to this motion to seal, and no objection has been filed. *See Padco Advisors, Inc. v. Omdahl*,

30

179 F. Supp. 2d 600, 614 (D. Md. 2002) (suggesting that the notice and objections requirements had been met because the motion had been on the docket for an amount of time sufficient for objections to be made).  Less drastic alternatives to sealing—such as targeted redaction—would be overly burdensome given the minimal public interest at stake.  In addition, the motion to seal is uncontested, the summary judgment motions at issue were denied, and the only reference in the above opinion to the documents is as proof of what they do *not* contain—evidence of any instruction to managers or trainers about how to communicate the wage structure to new employees.  The second motion to seal will therefore be granted.

### H.  Motion to strike affirmative defenses

On January 23, 2012, the individual defendants Sanford and DeVito filed an answer to the Fourth Amended Complaint that adopted all of the defenses raised by the corporate co-defendants but also stated several additional defenses.  (ECF No. 146.)  Plaintiffs moved to strike two of these defenses: (1) that any interpretation of the FLSA resulting in liability in the instant case would be unconstitutional, and (2) that there is no "overtime" for restaurant employees in Maryland.  (ECF No. 149.)  The motion to strike argues that the two defenses are frivolous and therefore the court should strike them pursuant to Fed. R. Civ. P. 12(f), under which a "court may order stricken from any pleading any insufficient defense . . . . "  Fed. R. Civ. P. 12(f).  The individual defendants have not opposed the motion, so the court will assume that the defenses have been abandoned.  *Cf. Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1246–47 (D. Md. 1997) (noting that a plaintiff's failure to respond to arguments in a summary judgment motion may constitute waiver or abandonment of a claim).  Plaintiffs' motion to strike will therefore be granted.

## **CONCLUSION**

For the above reasons, only plaintiffs' motion to seal and motion to strike affirmative defenses will be granted.  All other pending motions will be denied.[15]

A separate order follows.


August 20, 2012 _____/s/_____
Date                                                          Catherine C. Blake
                                                              United States District Judge

---

[15] At this point, plaintiffs' motion to amend the scheduling order, (ECF No. 155), is moot.  A new schedule will be set taking into account these rulings.